STATE of Missouri, Respondent,

v.

**J. B. JOHNSON, Appellant.**

No. 38498.

Missouri Court of Appeals, Eastern District, Division Four.

March 24, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 1981.

Application to Transfer Denied June 8, 1981.

**536**

Paul R. Otto, Kristie Green, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Clayton, for appellant.

William M. Kunstler, New York City, David A. Lang, St. Louis, for respondent.

STOCKARD, Special Judge.

J. B. Johnson was charged with and found guilty by a jury of murder in the first degree, and was sentenced to life imprisonment. He has appealed from the ensuing judgment. For the report of a previous appeal, see *State v. Johnson*, 524 S.W.2d 97 (Mo. banc 1975).

Appellant did not file a timely motion for new trial. Therefore, there are no assignments of error preserved for appellate review. *State v. Emory*, 563 S.W.2d 120 (Mo.App.1978). However, a point not preserved may be reviewed under Rule 29.-12 (formerly Rule 27.20(c)) to determine whether there occurred plain error affecting substantial rights which resulted in manifest injustice or a miscarriage of justice. *State v. Davis*, 566 S.W.2d 437 (Mo. banc 1978). This review pursuant to Rule 27.20(c) is limited, and relief under the plain error rule is not justified unless the error is determined to have had a decisive effect on the jury. *State v. Collins*, 520 S.W.2d 155 (Mo.App.1975).

Appellant does not challenge the sufficiency of the evidence, but we shall set it forth in sufficient detail to demonstrate that such contention, if made, would be without merit.

A jury could reasonably find that shortly before three o'clock in the afternoon of January 23, 1970 two black men, one being Robert Lee Walker and the other being appellant, entered University City Jewelers at 6360 Delmar and asked Adam Bakos, the owner, about wedding rings. The two men left, but about fifteen minutes later they returned, and Walker told Bakos he wanted to buy a ring. When Bakos opened a case containing rings, Walker drew a gun and told Bakos not to make a false move or he would shoot. However, Bakos managed to set off a silent alarm. Walker forced Bakos to open a safe in a back room, and he then tied up Bakos and removed his watch and wallet. While lying face down in the back room, Bakos heard the cash register in the front of the store open, and he heard appellant say "let's go." Mr. Bakos also heard the front door open and close, and he then

heard the front door open and close a second time. It was at the second opening and closing of the door that Police Detectives Jim Boevingloh and William Schwartz, who had responded to the silent alarm, entered the store. Detective Boevingloh called out Bakos' name several times, but Bakos made no reply under threat by Walker. Detective Boevingloh opened the door to the rear of the store and told Detective Schwartz, "he's all tied." Walker then opened fire and Detective Boevingloh fell to the floor after exchanging shots with Walker. Detective Schwartz helped Detective Boevingloh out of the store, and he then shot and captured Walker as he attempted to leave the area. Detective Boevingloh subsequently died from the gun shot wounds received in the exchange with Walker.

Police Officer Gary Kanneberg arrived at the scene in time to see Detective Boevingloh stagger from the store, and to see Walker's apprehension. A person standing twenty to thirty feet to the east yelled that "one" ran south across a parking lot. Officer Kanneberg ran to that parking lot and into an alley to the rear of the jewelry store where he observed "a large amount of money and change" lying in the snow. He also saw a single "line of footprints" along the entire length of the yard, and "up in the yard" he observed a black male, identified as appellant, wearing a yellow sweater and dark pants walking east. John Bernard, a security guard for a subdivision in the area followed appellant and saw him approach a service station, and he radioed this information to Officer Dowling who arrested appellant as he was getting into a cab. When appellant was taken to police headquarters he first gave his name as James Bene Hall. He was ordered to remove his shoes, and when he did so two rings, identified by Mr. Bakos as being stolen from his store, were found. Appellant first stated that he had bought the rings, but he later stated he had obtained them from a person named "Frog" with whom he had been playing craps. Police Officer Kanneberg returned to the area of the footprints and compared appellant's shoes with the footprints in the snow, and

they "appeared to fit." Pictures of the shoes and the prints were taken and introduced into evidence. Near to the University City Jewelers was found an automobile, identified as belonging to Walker, in which was found numerous rings and ring boxes which had been taken in the robbery. These rings and ring boxes could not have been placed in the automobile by Walker. There was also a wooden ring tray, which had been taken in the robbery, on which was found the print of the left index finger of appellant.

This evidence clearly presented a submissible case for the jury.

In appellant's first point he asserts that the trial court "committed plain prejudicial error" by its failure to declare a mistrial "after the prosecutor stated to the jury in closing argument that appellant had been convicted of the crime with which he had been charged in the instant case by an earlier jury," when, according to appellant, (a) there had been no reference to the verdict rendered in the first trial of appellant, and the verdict in that trial had only been referred to in connection with voir dire of some prospective jurors who recalled hearing of the first trial, and (b) which remark was inflammatory and not supported by the evidence.

In order to consider this contention of "plain judicial error" reference to some of the testimony is essential.

In his brief to this court appellant asserts that "[t]he earlier trial had been referred to only in connection with voir dire of a few prospective jurors who recalled hearing of the first trial."

It was brought out on voir dire examination of the prospective jurors that three of the twelve selected were aware that there had been a previous trial of appellant. However, this was not the only reference to the former trial or the verdict in that trial. We find that during the trial there were not less than sixteen occasions when by reason of questions asked by *appellant's* counsel of witnesses the jury was made aware that there had been a previous trial,

and that the pending case was a retrial. In addition, there was at least one occasion when by reason of questions asked by *appellant's* counsel the jury was informed three different times that appellant had been *convicted* by the jury at the previous trial. We set out that occasion.

When Eugene Raemdonck, a witness called by the State, was testifying on cross-examination the issue arose as to when he first reported the fact that he had some information concerning appellant's activity on the day of the crime. On redirect examination he was asked: "Why did you wait so long to call someone or tell someone?" He answered:

"Well, the man had been *convicted*[1] really and there was no point to our testifying and until he got out, why—and I read the paper that there was a judicial error or some reason that they couldn't identify the man that had been west of Skinker, that is why he had gotten out. So I remembered the incident and thought, well, I know somebody was west of Skinker. That was the reason for it."

There was no objection to the above answer. Then on re-cross the following question was asked by Mr. Kunstler.

"* * * Now, Mr. Raemdonck, you say that it wasn't until you read something in the newspapers that you decided to come forward and this had to do with the reason why the Supreme Court reversed the *conviction* in this case."

Later, the witness was asked if he recalled the date, and when he said he did not, Mr. Kunstler stated:

"If I tell you it was July 14, 1975, you wouldn't dispute that, would you? The Supreme Court of Missouri reversed this *conviction*."

There followed further re-cross examination in which Mr. Kunstler asked in the presence of the jury that the prosecutor "agree with me that the reversal was on July 14, 1975." He then asked about the news item read by the witness, and then stated in the form of a question, "[t]hat the

*conviction* had been reversed by the Supreme Court of Missouri?"

In the initial portion of the State's closing argument counsel commented, without objection, as follows:

"Why didn't she [Mrs. Raemdonck] come forward earlier? Well after Johnson had been *convicted* and reversed * *."

Contrary to appellant's assertion in his brief the jury was fully advised that appellant had previously been *convicted* and that the pending case was a retrial.

During appellant's closing argument to the jury his counsel attacked the State's case as fabricated, and specifically argued that certain police officers who stated in the present trial that they had changed their testimony from the first trial did so to save the State's case. The argument included the following:

"* * * If these were lies, why did they change their story. What the original story, of course, you would see the whole thing. They have to change from the original story because unknown to them in the first trial, this picture rose to haunt them. This picture showed a picture taken at between 8 and 8:45 according to the first trial.

\* \* \* \* \* \*

"For the record it shows seven rings. They admit now that two of these rings were the rings allegedly found in J. B. Johnson's shoe four hours earlier. Confronted with that, the story has to change. They can't give you the testimony of the first trial because that would wreck their case, and so you were treated to the spectacle of two officers who came here, sat here, and he said they were embarrassed * * * "

Appellant's counsel later commented in closing argument as follows:

"* * * I would just like to close by indicating to you that we have a Defendant here who is now twenty-six, who was eighteen at the time, who has spent thirty-four months in jail, who is on trial for

1. Emphasis has been added when the emphasized word appears in a quotation.

the second time. *You all know because you haven't been able to hide it that he was convicted at the first trial, and sentenced to the pen.*"

Following this the State made its closing argument which included the following:

"MR. DITTMEIER: If it please the Court: It is amazing, Ladies and Gentlemen, that anybody ever gets involved in the criminal process, or criminal procedure, or gets involved in this business at all, because every time the evidence is against somebody, they holler 'frame.' Every policeman—

"MR. KUNSTLER: I am going to object to that, Judge. There is no evidence every time people holler 'frame.' I think that is beyond the bounds; there is not a single bit of evidence of that.

"THE COURT: Overruled.

"MR. DITTMEIER: Do you think I would sit down with any witness in this case to fabricate, straighten out a fabrication so it could be more salable? If you do, well, then walk him out of the courtroom. I have never done that, and I wouldn't be a party to it. If something is the truth, it is the truth.

"And the business with that ring tray. The truth is that that was photographed on February 2nd. Now Mr. Kunstler stands up here and tells you that the State has to change that because it might wreck the State's case. That evidence, he says, will wreck the State's case, so they have to change it. You have proof it wouldn't wreck the State's case, because the first time that evidence was put in, twelve people said he was guilty.

"MR. KUNSTLER: Your Honor, I object to that. Judge, I object to that. I think that is inflammatory, and if he is going to say that, we can tell the jury why that case was reversed, what the State did to cause that reversal—

"MR. DITTMEIER: Let's tell them why—

"MR. KUNSTLER: —Because the prosecutor—

"MR. DITTMEIER: —tell them why—

"MR. KUNSTLER: —that the State was fraudulent—

"REPORTER'S NOTE: (At this point there continued a heated altercation between counsel, each simultaneously with the other, without intervention by the Court, and the record is silent on the same.)

"THE COURT: Proceed, gentlemen.

"MR. DITTMEIER: The point is that that does not wreck the State's case, because that was in evidence last time, and the defendant was convicted, and it could have been in evidence that way again. But what am I supposed to do when it is not true? The photographs were taken on February 2nd."

As far as the record before us shows, appellant's counsel did not ask for a mistrial, nor did he ask that the argument be stricken and the jury be instructed to disregard it.

Appellant argues that the statements of the prosecutor were a direct attempt to persuade the jury that since appellant had been convicted by a jury in the first trial, he should be found guilty by the present jury. This treats the argument out of context. Regardless of whether the subject of the argument was or was not proper, it clearly was in reply to appellant's argument that the State had to change the evidence or wreck its case.

The jury, was clearly informed, with the full participation of appellant's counsel, that this was a second trial of appellant, and that in the first trial he had been found guilty and convicted, but that that conviction had been reversed on appeal. In oral argument appellant made a vigorous attack on the fact that several policemen had presented a change in their testimony at the pending trial, and he asserted that the change was necessary to save the State's case. The prosecutor then denied that a change was necessary to save the State's case because with the original evidence appellant had previously been convicted; a fact fully known to the jury, and with the knowledge of that fact coming from appellant. We do not rule whether that argu-

ment was permissible under the circumstances. It was made, and when appellant objected he did so on the ground the argument was "inflammatory" but not for the reason now advanced in appellant's first point in his brief, and not for the reasons set forth in the argument under that point. Also appellant sought no affirmative relief from the court.

Referring back to appellant's point under consideration; it is that plain error resulted when the prosecutor stated to the jury that "appellant had been convicted of the crime" for which he was then being tried "when there had been no reference to the verdict in appellant's first trial." From the above it is obvious that the basis of appellant's point is factually incorrect. In addition, and more importantly, it was appellant who supplied the jury with the information that he was convicted at the previous trial.

▇▇▇▇ Every error, assuming the argument complained of constituted error in view of the total circumstances, which might occur in the trial of a case does not necessarily require the granting of a mistrial even when requested. *State v. Camper*, 391 S.W.2d 926 (Mo.1965), and rarely when not requested. The granting or refusal of a mistrial for improper argument lies largely within the discretion of the trial court. *State v. King*, 334 S.W.2d 34 (Mo. 1960), and as a general rule "closing argument will rarely affect substantial rights so as to result in plain error," within the meaning of Rule 29.12. *State v. Jones*, 571 S.W.2d 741 (Mo.App.1978); *State v. Mayfield*, 562 S.W.2d 404 (Mo.App.1978); *State v. May*, 479 S.W.2d 451, 456 (Mo.1972); *State v. Umfleet*, 587 S.W.2d 612, 616 (Mo. App.1979); *State v. Rauch*, 583 S.W.2d 298, 300 (Mo.App.1979); *State v. Bryant*, 548 S.W.2d 209, 211 (Mo.App.1977); *State v. Wendell*, 547 S.W.2d 807, 820 (Mo.App. 1976); *State v. Sanders*, 541 S.W.2d 782 (Mo.App.1976); *State v. Brown*, 528 S.W.2d 503, 505 (Mo.App.1975).

▇▇▇ In this case there was no request for a mistrial or other affirmative relief, it was appellant who informed the jury that appellant had previously been convicted, the complained of comment by the prosecutor was clearly retaliatory in nature, and the basis of appellant's point on this appeal is factually without foundation. In these circumstances the failure of the trial court to grant a mistrial for the reason asserted cannot constitute plain error affecting substantial rights, and certainly no manifest injustice or miscarriage of justice resulted therefrom.

By his second point appellant asserts the trial court committed plain prejudicial error by failing to declare a mistrial "after the prosecutor made three additional inflammatory and prejudicial arguments to the jury" as follows: (a) the statement to the jury that the victim of the murder "would never be more than thirty-six years old;" (b) the statement that an acquittal would brand the police officers who testified as witnesses as liars and would brand the prosecution witnesses Eugene and Betty Raemdonck as liars; and (c) his statement that he personally would never be guilty of condoning or presenting false evidence.

The statement made by the prosecutor referred to in (a) above was as follows:

"Mr. Kunstler stood up here and told you James Ben Johnson was nineteen when this happened, and is now twenty-six. Well, Jim Boevingloh was thirty-six and is still thirty-six.

"Let me ask you this: When you sit in here and listen to a case like this, it is like reading out of a storybook. There were chuckles during the case. You heard the name Jim Boevingloh; how many of you have thought of what Jim Boevingloh looked like? Have any of you tried to picture what he looked like? Have any of you thought what kind of person he was?

"MR. KUNSTLER: Your Honor, I object. I think this is really inflammatory.

"THE COURT: Sustained.

"MR. DITTMEIER: Well, I just hope when you get back there you don't forget Jim Boevingloh.

"MR. KUNSTLER: Your Honor, he is just going to continue, and I think it is improper.

"MR. DITTMEIER: I am sorry I brought up the fact somebody was killed. We are supposed to forget that.

"MR. KUNSTLER: Judge, he is trying to use inflammation to win a case. I think it is unfair. You sustained and he went ahead. If that is what we are going to resort to in this court, I think it is unfair to the defendant and the law.

"THE COURT: Sustained."

We are impelled to point out that in appellant's brief he states that "the most prejudicial statement made" was to the effect that the victim would never be more than 36 years old, and he then adds: "Perhaps promoted by the Court's failure to sustain an objection to this statement, the prosecutor continued: * * *." He then quotes the statement which started with "How many of you have thought of what Jim Boevingloh looked like?" The quotation from the transcript set forth above shows that the appellant made no objection to the statement that the victim would never be more than 36 years old, and appellant is in error when he asserts in his brief to this court that the court failed to sustain an objection to that statement.

We need not determine whether the statement made was improper. There was no objection at the time. Appellant asserts as plain error the failure of the court to declare a mistrial *sua sponte*. The trial court has considerable discretion in monitoring the content of closing argument, and to justify relief as plain error an abuse of discretion must be shown which results in manifest injustice or a miscarriage of justice, and as previously stated, closing argument will rarely meet that test. This contention is totally without merit.

The statement made by the prosecutor referred to in (b) above was as follows:

"Well, when you get back in that jury room and you think of what the purpose of the law is—and there is a lot more at stake there than J. B. Johnson, a lot more. When you go back there, if you choose not to follow the law, if you cop out, you will be branding every police officer involved in this case a liar. You will be branding—

"MR. KUNSTLER: Your Honor, I object.

"MR. DITTMEIER: —Mrs. Raemdonck a liar.

"MR. KUNSTLER: Judge, I just don't think these inflammatory comments are proper; I object to them.

"THE COURT: Overruled.

"MR. DITTMEIER: You will be branding Mrs. Raemdonck a liar; right on down the line. So think about the results of your verdict. You have got an opportunity now to send a message out to every would-be stick-up man on the street, anybody that wants to go out with a loaded gun—

"MR. KUNSTLER: Your Honor, I am going to object to that. That is not fair comment, saying for them to use this verdict to influence other people, and I think it is wrong. I object to it.

"THE COURT: Sustained.

"MR. DITTMEIER: Judge, deterrent is absolutely good argument. It is part of the sentence deterrent.

"THE COURT: I will sustain as to the form in which it was argued."

In this case, appellant again asserts prejudicial plain error resulting from the failure of the court to declare a mistrial *sua sponte*. Mr. Kunstler had argued that certain testimony of the police officers was a "total fabrication in the case," and he referred to certain testimony as "an untruth." Most of his argument was directed primarily to the contention that the State's case was based on fabricated testimony. In the exercise of its discretion to control argument the court could well have considered the argument of the prosecutor to be retaliatory. In any event, the trial court did not commit plain error resulting in manifest injustice when it did not *sua sponte* direct a mistrial.

The statement of the prosecutor referred to in (c) above has previously been quoted. There was no objection made, and no request for a mistrial. For the reasons set forth in our discussion of contentions (a)

and (b) the court did not commit plain error in not declaring *sua sponte* a mistrial.

In appellant's third and final point he asserts the trial court committed plain and prejudicial error "by continuing to proceed against defendant after the prosecuting attorney failed to comply with the order of said court demanding full disclosure of all materials in the State's possession relating to the trial of defendant with the exception of work product said failure to disclose resulting in denial of evidence to defendant favorable to his case."

We first note that this point does not set forth what material was not disclosed, and it does not set forth the evidence thereby denied to appellant. However, from the argument portion of appellant's brief we find that he claims he was not timely furnished certain photographs. We also note that although the contention in the point is that the court erred in "continuing to proceed" in the case, appellant did not ask for a continuance or any delay to afford time to study or evaluate the photographs not previously furnished.

On September 19, 1975 appellant filed a request for discovery, which included any photographs within the possession of the prosecution. On April 20, 1976, two defense attorneys and a consultant examined photographs and other physical evidence at the office of the prosecutor. It is appellant's contention that several photographs then in existence were not shown to them. However, because of the volume of evidence presented, and the lack of a method of control, it is not reasonably certain what, if anything, was not made available to appellant's attorneys. It is evident, however, that there was no intentional withholding of material.

The trial court held a hearing on the motion to dismiss for failure to produce all photographs on April 20, 1976. From the discussions at the hearing it appears that the photographs which appellant claims were not seen by his attorneys on April 20, 1976 were two photographs of shoe prints in the snow and at least one photograph of the ring tray containing rings. We shall assume that this is correct. The trial court overruled the motion to dismiss because of the failure to produce all available material with the understanding that all material had prior to that ruling been made available to appellant.

Although appellant's motion for new trial was not timely filed, it is noteworthy that when filed it did not allege that the State failed to make timely disclosure of the photographs.

▇▇▇ Pursuant to Rule 25.03 (formerly Rule 25.32) the State is required to turn over any photographs in its possession to the defendant in response to a motion for discovery. See *State v. Sykes*, 559 S.W.2d 643 (Mo.App.1977). The imposition of a sanction for failure to comply with this rule is in the discretion of the trial court, and the court may order the disclosure of the material not previously disclosed, grant a continuance, exclude such evidence, or make such other orders it deems just. Rule 25.16 (formerly Rule 25.45). Mere failure to disclose in and of itself does not entitle a defendant to a new trial. It must be shown that the non-disclosure resulted in fundamental unfairness or that the trial court abused its discretion in refusing to impose a proper sanction. *State v. Davis*, supra; *State v. Harrington*, 534 S.W.2d 44 (Mo. banc 1976).

In this case, the prosecutor made every reasonable effort to supply appellant the material claimed to have been withheld when he learned that some photographs might not have been examined by appellant's counsel. The court directed that all photographs be made available to appellant, which was one of the sanctions mentioned in Rule 25.16. Appellant's counsel had the photographs for approximately two weeks prior to trial. We also note that appellant contends that a criminalist was hampered in his investigation by late disclosure of the photographs showing shoe prints in the snow. But when those photographs were offered in evidence appellant did not object on the ground they were not timely made available to the criminalist.

The remedial action taken was discretionary with the court, and the facts and circumstances do not indicate an abuse of that discretion. Certainly, there was no plain error adversely affecting substantial rights which resulted in manifest injustice or miscarriage of justice, and this point is totally without merit.

The judgment is affirmed.

SMITH, P. J., and WEIER, J., concur.