**STATE of Missouri, Respondent,**

v.

**Eric D. CLEMMONS, Appellant.**

No. 69422.

Supreme Court of Missouri,
En Banc.

June 14, 1988.
Rehearing Denied July 26, 1988.

---

1. *See Lippard v. Houdaille,* 715 S.W.2d 491, 500     (Welliver, J. dissenting).

Nancy A. McKerrow, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Chief Justice.

Defendant Eric Darnell Clemmons, an inmate at the Missouri State Penitentiary, was convicted of the first degree murder, § 565.020, RSMo 1986, for slaying another

inmate, Henry Johnson, and sentenced to death. The jury found the following aggravating circumstances: (1) the defendant had a prior murder conviction, § 565.032.2(1), RSMo 1986; (2) the defendant had a prior first degree assault conviction, § 565.032.2(1); (3) at the time of the murder the defendant was in the lawful custody of a place of lawful confinement, § 565.032.2(9), and (4) the murdered individual was an inmate of the Missouri State Penitentiary, § 565.032.2(13). Affirmed.

Defendant contends the evidence was insufficient to support a jury finding that he acted deliberately, a key element of first degree murder. Section 565.020.1. (No challenge is made as to the sufficiency of the evidence to establish the other elements of first degree murder.)

In assessing a challenge to the sufficiency of the evidence, the evidence, together with all reasonable inferences to be drawn therefrom, is viewed in the light most favorable to the verdict and evidence and inferences contrary to the verdict are ignored. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

Defendant and Henry Johnson were cellmates in the Missouri State Penitentiary (MSP). Due to problems between the defendant and Johnson, which they would not specify to correctional officers, defendant was moved to a different cell on about July 1, 1985. The move, according to George Brooks, the chief investigator at MSP, appeared to alleviate the problems between the two inmates and defendant later told Brooks that there had been no further trouble between himself and Johnson.

A little over a month later, on August 7, 1985, at shortly before 9:00 p.m., Corrections Officer Thomas Steigerwald walked out of the main corridor of MSP into an open area of the prison grounds called the upper lawn. Immediately after coming onto the upper lawn, Steigerwald saw Morris Cavanaugh, another employee of MSP, and the two exchanged brief greetings.

Both Steigerwald and Cavanaugh noticed a group of inmates standing around in a little circle near the entrance to Housing Unit 3. Most of the inmates in this group appeared to be talking together, but two of them stood a little apart from the rest. One of these two, who was standing between the other inmates and the entrance to the main corridor, was looking towards that entrance. The other, who was standing between the other inmates and the entrance to Housing Unit 3, was facing the other inmates. Steigerwald could see no signs of ill temper or threatened violence from any of the inmates in the group.

As Steigerwald began to walk toward the group he saw one of the inmates, who was the only one of the group wearing a gray sweatshirt, move a few feet toward another of the inmates, grab that inmate, and strike him in the upper left chest. The inmate in the gray sweatshirt followed this blow up with a roundhouse blow to his victim's left side. At that time Steigerwald did not see a weapon in the attacking inmate's hand and he thought the blows were simply closed fist punches. As Steigerwald continued on toward the group of inmates the inmate who had been attacked, Henry Johnson, ran past Steigerwald to the entrance to the main corridor. He had blood on the front of his shirt and on his pants. Steigerwald then realized that the blows he had seen had been with a knife and he ran toward the inmate in the gray sweatshirt while broadcasting over his radio that a stabbing had occurred and that he needed assistance.

The inmate in the gray sweatshirt started walking with another inmate away from Steigerwald toward the back of the prison chapel. This other inmate wore what appeared to be a gray towel wrapped around his head and had beads around his neck. When Steigerwald drew within 10 to 12 feet of the two inmates he saw both their faces clearly. Steigerwald also saw a knife sticking out of the right hand of the inmate in the gray sweatshirt. The knife was a flat piece of metal about four or five inches long, with both sides sharpened to where it made a point at the tip. At about this time

the inmate wearing the towel and beads broke off from the inmate in the gray sweatshirt, dodged around to Steigerwald's right side, and headed back in the direction of the entrance to Housing Unit 3. The inmate in the gray sweatshirt continued on behind the chapel.

Steigerwald, choosing to continue after the inmate in the gray sweatshirt, ran around the front of the chapel to cut him off on the other side. The inmate was out of Steigerwald's sight until they approached each other on the other side of the chapel. As they approached each other at that time Steigerwald got another clear look at the inmate but he did not see the knife again. When the inmate saw Steigerwald on the other side of the chapel he turned around and started back the way he had come. Steigerwald also retraced his steps, again losing sight of the inmate while they were on opposite sides of the chapel.

After coming back around the chapel, Steigerwald saw the inmate heading toward the entrance of Housing Unit 3. Steigerwald caught up with the inmate just inside the doors of the Housing Unit and took him into custody. The inmate was identified as defendant Eric Darnell Clemmons. No weapon was found in defendant's possession. A search of the upper lawn and surrounding areas for the knife was also unsuccessful. The weapon was never found.

At the time defendant was taken into custody he was wearing what appeared to be a white sweatshirt instead of the gray sweatshirt Steigerwald had initially seen him wearing. It was soon discovered, however, that defendant was wearing a gray sweatshirt turned inside out so that the white lining was showing. When the sweatshirt was turned right side out a smear of blood was visible on the right sleeve.

After taking defendant into custody and leaving him at the control center, Steigerwald began looking through Housing Unit 3 for the inmate wearing the towel and beads that he had seen walking with defendant. Steigerwald found this inmate in one of the cells. He was identified as Keith Brown. Corrections officers searched Brown's cell where they found a hat and a school book which had been splattered with blood. Papers in the school book bore defendant's name and inmate number. A corrections officer reported that he had seen Brown carry this hat and book into Housing Unit 3 shortly after the stabbing had occurred.

While Steigerwald had been pursuing defendant through the upper lawn, Henry Johnson, the victim of the stabbing, ran up to the entrance to the main corridor. Corrections Officer Brian Smith saw Johnson was bleeding profusely from the chest and signaled another officer to open the gate. Smith could not get Johnson to lie down until help arrived so he escorted Johnson to the prison hospital. When Smith asked what happened, Johnson said only that "they have stuck me in my heart." Johnson died shortly after arriving at the hospital.

Approximately an hour and a half after defendant was taken into custody he was questioned about the death of Henry Johnson. Defendant waived his *Miranda* rights and gave a statement in which he denied stabbing Johnson. While defendant was being taken to a maximum security cell after investigators had finished questioning him, however, he spontaneously remarked to an accompanying officer, "I guess they got me."

An autopsy revealed the cause of Johnson's death to be a stab wound inflicted on the left side of his chest which had penetrated the left ventricle of his heart. The depth of the wound was about four inches. In addition, Johnson suffered a stab wound to his left side, another under his right arm, and a scratch on his right shoulder which may or may not have been inflicted at the same time as the other wounds. The knife blade which caused the fatal wound and at least the two other major wounds was flat and sharper on one side than the

other. The fatal wound must have been inflicted with considerable force because the blade entered Johnson's body perpendicularly to his ribs and thus had to cut, break, or spread the ribs in some way so that the blade could travel as far into the body as it did.

Forensic analysis of the smear of blood found on the sleeve of the defendant's sweatshirt showed that it was human blood, but further tests to type the blood were inconclusive. The blood splatters on the hat found in Keith Brown's cell were found to be human blood of either type B or type AB. Henry Johnson's blood was type B.

■ "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 1986. The evidence that immediately before the stabbing none of the inmates in the group in which defendant and Henry Johnson were standing showed signs of ill temper or threatened violence gives rise to the reasonable inference that the defendant's subsequent actions were not motivated by sudden strong emotion. The evidence that defendant had to take a few steps toward Henry Johnson before grabbing him and striking him in the chest with what was eventually determined to be a knife gives rise to the reasonable inference that defendant reflected for at least the time it took to reach Johnson before striking him. These inferences alone support a jury finding of deliberation. *See State v. Mallett*, 732 S.W.2d 527, 533 (Mo. banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987), and *State v. Roberts*, 709 S.W.2d 857, 862–63 (Mo. banc), *cert. denied*, 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986), for somewhat similar facts which were found to support a finding of deliberation.

Moreover, the evidence here also gives rise to the reasonable inference that the killing of Henry Johnson was a prearranged murder and a deliberate act. The jury could have reasonably inferred that the two inmates standing slightly apart from the group containing defendant and Henry Johnson were lookouts, one watching the area between the group of inmates and the entrance to the main corridor and the other watching the inmates in the vicinity.

Additionally, after the stabbing, defendant and Keith Brown began walking together away from the scene. Then, after discovering Steigerwald rushing toward them, they split up, with Brown taking a hat and a school book containing papers bearing defendant's name and prison number into Housing Unit 3 and then on into his cell. The book and hat had blood splatters on them. From this evidence the jury could reasonably have inferred that defendant and Brown had planned to come together after the stabbing so that, in the event of pursuit, defendant could hand off to Brown items which might connect him to the act. Upon seeing Steigerwald coming toward them, defendant and Brown executed the plan. Defendant handed Brown those items with blood on them which could be easily transferred and then Brown dodged around the oncoming officer and headed for his cell. These reasonable inferences that defendant, with the aid of Keith Brown and others, planned, and then carried out, the murder of Henry Johnson further justify the jury's finding of deliberation.

■ Next to be considered is the defendant's contention that venireperson Betty Clark should have been excused for cause because she stated during *voir dire* that her son had been shot. Defendant asserts that this answer indicates that Clark would not have been able to sit as a fair and impartial juror in a murder trial. Defendant did not raise this ground in his motion for new trial and it has not been preserved for appeal. Nevertheless, this Court has reviewed this point under the plain error standard. A decision will be reversed for plain error only if manifest injustice or miscarriage of justice resulted from such error. *See* Rule 30.20.

Clark told the prosecutor about her son in response to his question asking the veni-

repersons about crimes of which they or members of their immediate family had been victims. After Clark and others had answered this question the prosecutor asked those venirepersons as a whole if they could put aside what may have happened to them or their family and give both the state and the defendant an "equal start." No one responded. Clark's silent assent that she could be a fair and impartial juror was sufficient reason for the trial court to reject defendant's motion to excuse her for cause. *See State v. Smith*, 649 S.W.2d 417, 427 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed. 2d 246 (1983).

Defendant suggests the trial court should have conducted an independent examination of Clark to determine whether she held any bias in favor of the prosecution as a result of her son having been shot. The burden, however, is on the defendant to probe into any area on *voir dire* which is considered to be grounds for disqualification. *State v. Riley*, 716 S.W.2d 416, 419 (Mo.App.1986); *State v. Hendrix*, 646 S.W.2d 830, 832 (Mo.App. 1982). This the defendant did not do. While at times the trial court has a duty to independently examine the qualifications of potential jurors, *State v. Draper*, 675 S.W. 2d 863, 865 (Mo. banc 1984), this duty arises only when a member of the venire gives an equivocal or otherwise uncertain answer concerning his or her ability to hear the evidence and adjudge the cause without bias or prejudice, *Riley*, 716 S.W.2d at 419; *Hendrix*, 646 S.W.2d at 832. Venireperson Clark gave no equivocal answers in this case. The trial court had no duty to excuse Clark for cause and its refusal to do so did not result in manifest injustice.

Defendant also assigns error to the trial court's admission of three photographs depicting the wounds of the victim on the grounds that they were cumulative, gruesome, and unduly inflammatory and thus that their prejudicial impact outweighed their probative value.

Trial courts exercise broad discretion in the admission of photographs.

*State v. Guinan*, 665 S.W.2d 325, 331 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Photographs, although gruesome, may be admitted if, among other things, they show the nature and location of wounds and they enable the jury to better understand the testimony. *State v. Gardner*, 618 S.W.2d 40, 41 (Mo. 1981).

The photographs at issue here showed the nature and location of the victim's wounds and enabled the jury to better understand the testimony of two doctors concerning the wounds and the cause the victim's death. The existence of oral testimony which described the facts portrayed in these photographs is no reason to reject their admission. *See State v. Clemons*, 643 S.W.2d 803, 805 (Mo. banc 1983). Two of the photographs corroborated Officer Steigerwald's eyewitness testimony of the stabbing. Steigerwald testified that he saw defendant use his right hand to stab Henry Johnson once in the left side of the chest and once, after a roundhouse swing, in the left side. One of the photographs showed a stab wound in the left side of the victim's chest which had entered at an acute angle to his left (the assailant's right). Another of the photographs showed a stab wound in Johnson's left side, which could have come from a roundhouse swing. The trial court did not abuse its discretion in admitting the photographs.

Defendant also argues that the prosecutor made statements to the jury during his closing argument in the guilt phase of the trial which were unsupported by the evidence and which were thereby prejudicial to him. Because defendant did not object to the statements at the time they were made or raise his objections to the statements in his motion for new trial, the Court reviews the challenged statements for plain error only. A court should rarely grant relief on assertions of plain error as to closing argument. *See State v. Johnson*, 615 S.W.2d 534, 540 (Mo.App.1981); *State v. Bryant*, 548 S.W.2d 209, 211 (Mo.App. 1977). This is because, in the absence of

objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.

■ Defendant first attacks the prosecutor's statement that the school book found in Keith Brown's cell had blood splatters on it. This was not a misstatement. Both the officer who seized the book and the investigator who took it into custody testified that they saw blood splatters on it. While the forensic analyst who examined the book testified that he found no blood on the book, he also stated that paper was not a good surface for preserving blood stains and that any blood on the book may have flaked off before his examination. It is reasonable to infer that there were initially blood stains on the book which eventually flaked off. The prosecutor has the right to argue evidence and reasonable inferences from the evidence, *State v. McDonald,* 661 S.W.2d 497, 506 (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The point is denied.

■ Defendant's second challenge concerns the following statement of the prosecutor:

Who was the only other person in the area who could have seen what was going on? Morris Cavanaugh. He saw that knife. What happened to Morris Cavanaugh, because he didn't see everything Tom Steigerwald did? Isn't it odd how some inmate came up and asked him a question, which caused him to turn away and talk for a couple of minutes? In fact until he heard somebody walk behind him and turned to see blood all over the floor—.

Defendant correctly points out that Cavanaugh was not the only other person in the area besides Officer Steigerwald who could have seen what was going on. There were at least four inmates who could have, and testified that they had, seen what happened. However, given that immediately prior to making this quoted comment the

prosecutor had stated that defendant and Henry Johnson had been in a loose group of several inmates at the time of the stabbing, it is apparent that the prosecutor meant that there were no other non-inmates in the area. The Court finds no manifest injustice.

■ Defendant also correctly notes that the prosecutor stated that Cavanaugh saw a knife when, in fact, he testified he had not. Considering the self-contradictory nature of the quoted statement and the undisputed evidence that Cavanaugh had not seen the knife, the jury could not have been misled by the prosecutor's misstatement. The trial court's failure to interrupt the prosecutor's argument on its own motion to correct the misstatement did not result in manifest injustice.

■ Next defendant complains that the prosecutor, in arguing against the credibility of the inmate defense witnesses, labeled them as "liars and [murderers] and thieves." Courts have held that name calling, while ill-advised, is not prejudicial where there is evidence to support such a characterization. *State v. Burke,* 719 S.W.2d 887, 891 (Mo.App.1986); *State v. Munoz,* 678 S.W.2d 834, 835 (Mo.App.1984).

Defendant called three inmate witnesses. One had convictions for filing a fraudulent income tax return, theft, and robbery. Another had convictions for robbery and burglary. The third, Keith Brown, had convictions for robbery and first degree assault and the jury could reasonably have inferred that he participated in the murder of Henry Johnson. There was evidence to support the prosecutor's characterization of the inmate witnesses. There is no error.

In addition to these challenges to prosecutorial statements, defendant, by *pro se* brief, contends that the prosecutor in three other instances misstated the evidence to his prejudice. These points also have not been preserved and the Court need review for plain error only.

■ First, defendant argues that the prosecutor misled the jury by prefacing a

question to an investigator of the murder of Henry Johnson with the comment "you stated that the smear of blood on the sweatshirt [the defendant had been wearing when he was taken into custody] appeared to be fresh when you saw it." In fact, the investigator had not said this and the only evidence as to the age of the blood stain was testimony from a forensic analyst that he had been unable to accurately test the blood because it was either too old or contaminated by some substance in the sweatshirt. Even if the jury was misled and believed the bloodstain to be fresh this did not result in plain error. The defense in this case was that Henry Johnson collided with defendant after Johnson had been stabbed and had begun running toward the hospital. Defendant urged that it was this collision between himself and Johnson that Officer Steigerwald had seen and then had mistakenly interpreted it as an attack by him on Johnson. Fresh blood on the defendant's sleeve was as consistent with the defense as with the prosecution's case. Given this consistency a jury's belief that the blood on the sleeve was fresh could not have caused manifest injustice to defendant.

▮▮▮ Second, defendant asserts that the prosecutor's claim during closing argument in the guilt phase that he had proven that the inmate witnesses were lying was not supported by the evidence. The prosecutor had pointed up certain internal contradictions in the testimony of these witnesses and also had specified inconsistencies between that testimony on one side and the physical evidence and other testimony on the other side. Considering these internal contradictions and inconsistencies it was reasonable for the prosecutor to infer that he had proven the inmate witnesses were lying. The prosecutor may argue inferences reasonably drawn from the evidence. *McDonald*, 661 S.W.2d at 506. The argument was not improper.

▮▮▮ Third, defendant complains that during his closing argument "the prosecu-

tor appeared to describe today[']s streets of America as comparable to those of Nazi Germany" in that they are inundated with "murder and mayhem." Defendant contends that there was no evidence to support the claim that murder and mayhem are common in this country. Contrary to the defendant's complaint, Nazi Germany was never mentioned by the prosecutor. The prosecutor did state that "[w]e've seen murder and mayhem on the streets of our cities day after day," but this was not improper. The prosecutor is permitted to argue such propositions as the prevalence of crime in the community and the personal safety of its inhabitants and such pleas may call upon common experience. *State v. McKinney*, 475 S.W.2d 51, 55 (Mo.1971). The point is denied.

Defendant's next argument to be considered is that Robert E. Lee, a teacher at MSP called by the defendant as a witness in the punishment phase of the trial, should have been permitted to give testimony concerning pressure exerted upon defendant by the victim to perform homosexual acts. The trial court sustained objections to three questions asked of Lee. This point was not preserved for appeal because no offer of proof as to the nature of Lee's testimony was made to the trial court. See *State v. Foster*, 700 S.W.2d 440, 444 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). Further, defendant testified to homosexual pressure by Johnson. There is no plain error.

Defendant contends the prosecutor improperly made prejudicial remarks during his closing argument in the punishment phase of the trial. These remarks were not objected to during trial nor was this point raised in the motion for new trial. The point is not preserved on appeal and review is for plain error—manifest injustice. As already stated in the discussion concerning the prosecutor's challenged statements during closing argument in the guilt phase, courts should rarely grant relief on assertions that plain error occurred in closing argument. See *Johnson*, 615 S.W.2d at 540; *Bryant*, 548 S.W.2d at 211.

The defendant first challenges the following remark of the prosecutor:

> Let me remind you of your oath. You swore that you would make your decision, not only on guilt or innocence, but on punishment, without sympathy, without prejudice, without hatred, without fear.

The oath given to jurors after they have been selected to serve does not mention sympathy, prejudice, hatred, or fear. The instruction read to juries after they are sworn does inform the jurors that they should perform their duties without prejudice or fear, but does not mention sympathy or hatred. *See* MAI–CR 3d 302.01.

■ Defendant claims that sympathy is, in fact, a proper consideration for the jury in deciding punishment and that this "reminder" to the jurors of a nonexistent oath swearing them to decide on punishment without sympathy caused them not to consider all proper mitigating circumstances. A jury may not be precluded from considering all relevant mitigating evidence. *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670, 90 L.Ed.2d 1 (1986).

■ Initially, defendant mistakenly equates "sympathy" with "mercy." A jury does have the power to grant mercy in that it may impose a life sentence even where it finds that aggravating circumstances outweigh mitigating circumstances. *See* § 565.030.4, RSMo 1986. The prosecutor expressly stated that the defendant's plea for mercy was "fine."

■ Sympathy, on the other hand, is not a proper factor for the jury to consider in reaching its decision as to punishment. A juror hearing the prosecutor's statement that they should render a decision without sympathy would likely interpret it as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence. *See California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987). This is where the distinction between sympathy and mercy can

be found. The mercy a jury is permitted to exercise must be grounded in the circumstances of the case, *see* § 565.030.4, whereas, if a jury was permitted to consider sympathy, its decision could be made in reliance on extraneous emotional factors, which would be far more likely to turn the jury against a capital defendant than for him, *see Brown*, 107 S.Ct. at 840. In *Brown*, the United States Supreme Court held that an instruction to the jury that they not be swayed by mere sympathy in making their determination as to punishment was not improper. *Id.* Similarly, the admonition here that the jury not consider sympathy in its punishment determination is not improper.

■ The prosecutor's statement concerning an oath to make its decision without sympathy, prejudice, hatred, or fear was incorrect but does not rise to the level of manifest injustice.

■ The prosecutor's other remark during closing argument in the punishment phase which is subject to a challenge by defendant was as follows:

> None of [us] here are so naive to believe that there will not be appeals and that Eric Clemmons will—none of us believe that Eric Clemmons is going to go right back to the Missouri State Penitentiary, if you sentence him to death, and die tomorrow. That's not true. However, you should presume, when you're making your decision, that that's what will happen.

Defendant argues that this comment was improper because this reference to appeals diminished the jury's sense of responsibility.

A plurality opinion of the United States Supreme Court, in *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), has stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death

rests elsewhere." The pivotal opinion in *Caldwell,* however, was Justice O'Connor's concurrence which stressed that prosecutorial remarks about appeals in capital cases are not constitutionally prohibited if the information provided is not misleading. The prosecutor's remarks in *Caldwell* were impermissible because they were misleading in a manner that diminished the jury's sense of responsibility in that the prosecutor did not tell the jury that the automatic review to which he referred was extremely limited in scope. *Id.* at 341–43, 105 S.Ct. at 2646–47 (O'Connor, J., concurring in part and concurring in the judgement).

The prosecutor's remark is not in the category disapproved by Justice O'Connor in *Caldwell.* He did not belabor the point as did the prosecutor in *Caldwell,* where the jury was told twice that their decision was not final and three times (including once by the court) that their decision was automatically reviewable. *See Caldwell, id.* at 325–26, 105 S.Ct. at 2637–38. Further, the prosecutor in this case told the jury it should presume that, if it returned a sentence of death, the defendant would be executed immediately. Additionally, any false impression the jury may have gotten that the responsibility for determining the defendant's sentence rested elsewhere would have been set right by the instructions. In the last instruction prior to deliberation on punishment the jury was told "[i]t is your duty, and yours alone, to render such verdict under the law and the evidence concerning the punishment to be imposed as in your reason and conscience is true and just." *See* MAI–CR 3d 313.49. This Court is convinced that there is no reasonable probability that the jury would have reached a different sentencing conclusion had it not heard the solitary and cursory remark concerning appeal and did not cause manifest injustice.

Next are defendant's assertions of instructional error in the punishment phase of the trial. Here again, review is for plain error only because these assertions were never raised before the trial court.

■ Defendant first argues that Instruction No. 12, in which the aggravating circumstances were submitted, does not comply with § 565.032.2, RSMo 1986, which states in relevant part:

Statutory aggravating circumstances for a murder in the first degree offense *shall be limited to the following:*

(1) The offense was committed by a person with a prior record of conviction of murder in the first degree, or the offense was committed by a person who has one or more serious assaultive convictions.... (Emphasis added.)

Instruction No. 12 was patterned after MAI–CR 3d 313.40, which mandates that each of a defendant's relevant prior convictions be enumerated as a separate aggravating circumstance. Thus, Instruction No. 12 permitted the jury to find defendant's prior capital murder conviction (for a time, what is now called first degree murder was called capital murder) and his prior first degree assault conviction as two separate aggravating circumstances. Defendant claims that by requiring separate submission of each prior conviction relevant under § 565.032.2(1), MAI–CR 3d 313.40 expands upon the limited number of aggravating circumstances established in § 565.032.2. The division of one aggravating circumstance into two in this case, defendant continues, prejudiced him "by emphasizing this circumstance and drawing the jury's attention to it."

Contrary to defendant's assertion the procedure under MAI–CR 3d 313.40 in no way adds any aggravating circumstance to those enumerated in § 565.032.2. Even though MAI–CR 3d 313.40 mandates separate submission of prior convictions, it only permits submission of those types of convictions that are authorized as aggravating circumstances under § 565.032.2(1).

Moreover, the structure of the death penalty statutes implicitly demands that each conviction relevant under § 565.032.2(1) be submitted separately. Once a jury finds even a single aggravating circumstance it may consider imposing the death penalty.

Section 565.030.4; *State v. Shaw*, 636 S.W.2d 667, 675 (Mo. banc), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). A jury finding that the defendant has any conviction relevant under § 565.032.2(1) is sufficient to meet this threshold requirement for jury consideration of the death penalty. Because a finding of any such conviction permits jury consideration of the death penalty, each one must be listed as a separate aggravating circumstance in the instructions in order to avoid confusing the jury. If the convictions were submitted together as one aggravating circumstance the jury would be confused about whether it could consider the death penalty if it believed one of the convictions existed but not the others.

The submission of the aggravating circumstances was proper, and there was no manifest injustice.

■ Defendant also contends that the trial court failed to comply with MAI–CR 3d 313.40 Notes on Use 3 and 4. These Notes state, in relevant part:

3. When paragraph numbered 1A [which submits the aggravating circumstance of a prior first degree murder] is submitted, the Court will first, outside the hearing of the jury, determine if the defendant has a prior conviction for murder. The prior murder conviction should be the equivalent of murder in the first degree under Section 565.020, RSMo 1986....

4. When paragraph numbered 1B [which submits the aggravating circumstances of prior serious assaultive convictions] is submitted, the Court will first, outside the hearing of the jury, determine if the defendant has "one or more serious assaultive criminal convictions." If the Court finds the conviction to be a "serious assaultive criminal conviction," this paragraph may be used....

The court in this case did not make the required determinations on the record. Only the questions of whether the prior convictions existed were submitted to the jury. It is the trial court which must determine that the submitted convictions are of the sort which § 565.032.2(1) establishes as aggravating circumstances and should make this determination expressly and on the record. Any error here, however, caused no manifest injustice. The defendant's prior conviction of capital murder was undeniably the equivalent of a conviction of first degree murder as presently defined. His first degree assault conviction for beating another with a pipe was certainly a serious assaultive criminal conviction. Thus, had the trial court made the necessary determinations there is no doubt that it still would have submitted the convictions at issue as aggravating circumstances. Further, the jury found two other statutory aggravating circumstances. The point is denied.

The next issue is defendant's claim that Missouri's death penalty statutes are unconstitutional because they provide no criteria to guide prosecutors in the exercise of the discretion they possess in deciding whether or not to seek the death penalty. Constitutional challenges identical to this one have previously been considered and rejected by this Court. *See, e.g., State v. Amrine*, 741 S.W.2d 665, 675 (Mo. banc 1987); *State v. Trimble*, 638 S.W.2d 726, 736–37 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983).

Defendant also challenges the inherent constitutionality of the death penalty. This Court has repeatedly rejected identical arguments. *See, e.g., State v. Mallett*, 732 S.W.2d 527, 539 (Mo. banc), *cert. denied*, — U.S. —, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987); *State v. Bolder*, 635 S.W.2d 673, 680 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

■ Finally, defendant attacks the jury's imposition of the death penalty in this particular case. He asserts that the sentence was imposed arbitrarily and that the sentence is excessive and disproportionate to the penalty imposed in similar cases. These assertions will be considered within

the Court's independent review of defendant's death sentence.

Section 565.035.3, RSMo 1986, mandates that the Court conduct an independent review of the imposition of all death sentences. That section requires the Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

With respect to the first prong of § 565.035.3, defendant argues that his sentence was imposed arbitrarily because the prosecutor told the jury they must render their decision without sympathy, because the jury was prevented from hearing relevant mitigating evidence which would have been provided in the testimony of Robert E. Lee, and because the jury's sense of responsibility was lessened by the prosecutor's comments concerning appeal.

The Court has already addressed the propriety of these occurrences and found no error, plain or otherwise.

The Court has carefully examined the record and does not find defendant's sentence was imposed under the influence of passion, prejudice, or other arbitrary factors.

The Court finds substantial evidence to support the jury's finding of the existence of the four submitted aggravating circumstances. Undisputed evidence leaves no question that the defendant had prior convictions for murder and for first degree assault. Further, the trial court was justified in submitting these convictions as aggravating circumstances because, as discussed above, these convictions were without a doubt the type of convictions § 565.032.2(1) contemplated as aggravating circumstances. The court's failure to expressly make a determination to this effect on the record for the prior murder and assault does not affect the sufficiency of the evidence supporting the existence of these two aggravating circumstances. And, the evidence is undisputed that defendant was in the lawful custody of a place of lawful confinement at the time of the murder and that Henry Johnson was an inmate at MSP when he was murdered.

In relation to the final prong of the Court's independent review of the defendant's death sentence, defendant argues that the imposition of the death sentence is excessive and disproportionate to the punishment imposed in similar cases because the weakness of the evidence that he acted with deliberation "makes imposition of the death penalty untenable." As already discussed above, however, the evidence here was sufficient for the jury to make a finding of deliberation. Further, this evidence was not weak. An eyewitness, Officer Steigerwald, saw the defendant approach Henry Johnson and strike him without apparent provocation with what was subsequently determined to be a knife. The jury's finding of deliberation was also supported by inferences from the evidence that the defendant enlisted the aid of cohorts to keep a lookout for him while he attacked Johnson and to take small items from him, after he completed the stabbing, which might connect him to the crime. The evidence here of deliberation was at least as great as that in *State v. Bolder*, 635 S.W. 2d 673, 677–78 (Mo. banc 1982) (defendant sentenced to death for the slaying of a fellow inmate), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

A comparison of the crime and the defendant in this case with those in similar cases further, and overwhelmingly, supports the imposition of the death penalty in this case. Defendant was convicted of the first degree murder of a fellow inmate while both were in the lawful custody of a

place of lawful confinement. This Court has consistently found death sentences imposed in such cases to be neither excessive nor disproportionate. *See, e.g., State v. Amrine,* 741 S.W.2d 665, 676 (Mo. banc 1987); *State v. Schlup,* 724 S.W.2d 236, 242–43 (Mo. banc), *cert. denied,* — U.S. —, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *State v. Driscoll,* 711 S.W.2d 512, 517 (Mo. banc), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986). Defendant was already serving a life sentence on a previous murder conviction at the time he murdered Henry Johnson. In each case since Missouri's death penalty was reinstituted in 1977 in which a defendant was convicted of first degree murder (or capital murder as the offense was known from 1977 until 1984) for a killing committed while the defendant was serving a life sentence on a previous murder conviction, the death penalty has been imposed. *See State v. O'Neal,* 718 S.W.2d 498 (Mo. banc 1986), *cert. denied,* — U.S. —, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987); *State v. Zeitvogel,* 707 S.W.2d 365 (Mo. banc), *cert. denied,* 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); *State v. Shaw,* 636 S.W.2d 667 (Mo. banc), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed. 2d 983 (1983). What this Court stated in *Bolder, id.* at 690, is equally applicable in this case:

> The life sentence that appellant is already serving for first degree murder did not deter appellant from committing still another murder. The imposition of yet another life sentence would serve no purpose other than to signal that there is no real cost for prisoners who kill while in confinement.

The sentence in this case is neither excessive nor disproportionate.

The judgment is affirmed.

DONNELLY, ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

WELLIVER, J., concurs and concurs in separate concurring opinion of BLACKMAR, J.

BLACKMAR, Judge, concurring.

I concur except as to the discussion of "sympathy" and "mercy" at page 910. I do not believe that the prosecutor's reference to a supposed oath that the jurors did not take is sufficient to require vacation of the sentence. I would also not preclude the prosecutor from arguing that the jurors should perform their duty without sympathy, if the prosecutor deems such an argument wise.

I cannot agree that "sympathy on the other hand, is not a proper factor for the jury to consider in reaching its decision." Nor do I agree with the statement that "the mercy a jury is permitted to exercise must be grounded in the circumstances of the case, *see* § 565.030.4, ... " The statute simply says "circumstances," and does not confine them to the case. It is the sense of the statute that the jury may decide against the death sentence for any reason that seems satisfactory to it, or for no reason at all. The jury should be instructed in terms of the statute, and should not be otherwise encumbered. A defense lawyer who argues for "sympathy" should not be interrupted by the court. *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), simply holds that a state may prescribe a form of instruction that we have not chosen to adopt.

I feel it necessary to express these views because I think that the principal opinion may induce trial judges to impose further restrictions on defense counsel, who already have a hard row to hoe in capital cases.