STATE of Missouri, Respondent,

v.

Joseph AMRINE, Appellant.

No. 68694.

Supreme Court of Missouri,
En Banc.

Dec. 15, 1987.

Rehearing Denied Jan. 20, 1988.

Kathleen Murphy Markie, Columbia, for appellant.

William L. Webster, Atty. Gen., Karen A. King, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Defendant appeals his conviction of first degree murder for killing fellow inmate Gary Barber in the Missouri State Penitentiary. The death penalty was imposed, hence the cause falls within this Court's exclusive appellate jurisdiction. Mo. Const. art. V, sec. 3. We affirm.

While defendant does not challenge the sufficiency of the evidence to support his conviction, we briefly summarize those facts which the jury reasonably could have found from the evidence. Defendant and the victim, Gary Barber, were housed in the special management unit or "super-max" area of the penitentiary during October of 1985. In early October, defendant became aware of "rumors" being circulated by Barber concerning an alleged incident in which Barber committed a homosexual act upon defendant when they were cellmates in the "general population" area of the penitentiary. Inmate Randy Ferguson testified that on October 3 he overheard a conversation between defendant and Joe Moore during which Moore commented "if somebody had treated him like that or done something like that to him, he would kill him." Defendant replied, "Don't think that that ain't what I plan to do." Ferguson also related that on October 7 defendant informed him and three other inmates that he planned to stab Barber the next day and wanted them to "block." Inmate Terry Russell testified that defendant told him that he intended to "stick" Barber when the inmates went to the "yard"; however, that opportunity did not arise. Russell explained that on the morning of October 8 defendant confronted Barber about the rumors, and after some discussion defendant and Barber came to where Russell was standing. Defendant asked Russell to repeat the accusations in front of Barber and Russell stated that Barber "was going around telling people he had sex with [defendant]," to which Barber did not respond. Defendant said "okay" and walked away, but a fight broke out between Russell and Barber as a result of the allegations and they were placed in detention until October 18.

Ferguson testified that on the evening of October 17, 1985, the night before Barber and Russell were released from detention, he overheard a conversation between inmates Omar Hutchison, Daryl Saddler and Clifford Valentine concerning a knife and observed Saddler go up to the floor above them and pass a knife down to Hutchison. Following lunch on October 18, the inmates from defendant's unit were released to the multipurpose room for recreation. Two guards, Officers Thomas Smith and John Noble, were on duty supervising the 45 to 50 inmates in the room that day. The doors to the recreation area were locked and the inmates could enter and exit the room only through the front door, which was guarded by Officer Noble. When Ferguson arrived at the multipurpose room he began working out on a punching bag and saw Hutchison enter the room, approach the window, remove an ice-pick type weapon from his waistband, and tape the weapon to the outside of the building.

Ferguson later saw defendant go to the window and retrieve the knife, which he placed in the waistband of his pants. Defendant approached Barber, who was sitting alone in the corner of the room, knelt

down, and started a conversation. The two men got up and began pacing around the room, during which time defendant placed his arm around Barber's shoulder. Defendant subsequently took his arm off Barber's shoulder, pulled the knife from his waistband and stabbed Barber in the back below the left shoulder blade. Defendant turned and ran while Barber removed the knife and chased defendant toward the front of the room. Barber then stated, "Joe, I'm going to get you," dropped the weapon and collapsed not far from Officer Noble. Shortly thereafter Barber died as a result of the stab wound. The stabbing was witnessed by Ferguson and inmate Jerry Poe, both of whom identified defendant as Barber's killer.

The defendant testified he was playing poker at a table in the multipurpose room at the time of the stabbing and did not see the chase or the fatal blow. He presented the testimony of several inmates who stated they saw Barber chasing Russell prior to collapsing. Officer Noble testified he did not witness the stabbing, although he saw Barber chasing another inmate whom he did not get "a real good look" at but identified as Russell. At trial, Noble stated he could not be sure of his identification and noted many similarities in the appearance of defendant and Russell. Defendant's theory that Russell murdered Barber was undermined by the testimony of Officers Dobson and Bowers, who corroborated Russell's statement that he had gone to the housing unit to get an aspirin and was not in the multipurpose room when the stabbing occurred. Additional facts will be related in connection with defendant's numerous assertions of error.

### I

Defendant, in what we perceive to be his principal point on appeal, contends that "the trial court committed plain error in failing, sua sponte, to admonish the State against presenting evidence [during the penalty phase] as to the effect of a death sentence on the prison population and against arguing to the jury that [defendant] should be given the death penalty be-

cause of its deterrent effect on other inmates...."

We initially consider the propriety of the prosecutor's argument concerning deterrence. Relief should rarely be granted on assertions of plain error as to closing argument, "for where no objection was lodged, trial strategy is an important consideration and such assertions are generally denied without explication." *State v. Newlon*, 627 S.W.2d 606, 616 (Mo. banc 1982). Furthermore, "we have long recognized that arguments on the deterrence of crime and the necessity of law enforcement and the need for society to protect itself need not have support in evidence, and such pleas may call upon common experience." *State v. McDonald*, 661 S.W.2d 497, 506 (Mo. banc 1983). Thus, the prosecutor's argument provides no basis for reversal in this case.

Nor do we believe the admission during the punishment stage of evidence pertaining to the deterrent effect of the death penalty in the unique setting of a correctional institution violates the constitutional rights of a defendant in cases where the aggravating circumstance that the murder was committed by a person in the lawful custody of a place of lawful confinement, section 565.032.2(9), RSMo 1986, is submitted to the jury.

In examining the constitutionality of the statutory predecessor of section 565.032.-2(9), we held:

The legislature, in adopting [section] 565.012(2)(9), [RSMo 1978,] reasonably could have concluded that the death penalty is appropriate when imprisonment already imposed does not deter capital murder. The imposition of capital punishment is rationally related to the state's obviously legitimate interests in preventing crime and protecting other persons, such as prison employees and other inmates, with whom prisoners come in contact.

*State v. Bolder*, 635 S.W.2d 673, 683 (Mo. banc 1982). We have further stated:

... the legislature legitimately could have aimed this aggravating circumstance at deterring all capital murders in

any prison. The legislature may have had several reasons: deterring those otherwise undeterred; protecting prison guards who daily serve the state in a dangerous environment; and protecting other prison inmates who are relatively defenseless in the prison environment. *State v. Trimble,* 638 S.W.2d 726, 737 (Mo. banc 1982).

■■■ It is evident from the statements quoted above that evidence concerning the deterrence of prison murders is relevant to the statutory aggravating circumstance that defendant committed the murder while in the lawful custody of a place of lawful confinement. It is important to remember that under the Missouri statutory scheme the jury must not only find whether the submitted aggravating circumstance existed, but must *weigh* it and consider whether it warrants the imposition of the death penalty. Section 565.030.4, RSMo 1986. Just as the State is not limited to a bare recitation of the defendant's prior convictions of serious assaultive crimes when that aggravating circumstance is submitted, *see State v. Schlup,* 724 S.W.2d 236, 238–40 (Mo. banc 1987), neither is it restricted to simply establishing that the murder was committed by a prison inmate when that aggravating circumstance is involved. It is difficult to properly assess how much weight should be accorded to the existence of this aggravating circumstance unless it is understood *why* the circumstance is considered aggravating and the reasons it was among those statutorily enumerated. Evidence pertaining to the problem of violence in the correctional facility where the murder occurred and the deterrent effect of the death penalty in that unique environment unfamiliar to jurors, therefore, is relevant in cases such as this.

■■ We are unpersuaded by defendant's argument that *State v. Gilmore,* 681 S.W. 2d 934 (Mo. banc 1984), militates against admission of evidence such as that presented here. In *Gilmore,* we found that the proposed testimony of sociologist James Gilsanin on the *general* deterrent value of the death penalty would have been irrelevant and that the court did not err in refusing to appropriate funds for the defendant to employ Dr. Gilsanin as an expert witness. In so doing we noted: "it is apparent from defendant's motion that Dr. Gilsanin's testimony would not have focused on the specifics of the defendant's case and, therefore, would not have assisted the jury in imposing a rational sentence." *Id.* at 941.

The evidence on deterrence in this case consisted of warden Armontrout's testimony, which was based on his lengthy experience as a correctional officer and his first hand observations in the Missouri State Penitentiary. It pertained to the specific environment in which the defendant committed the murder, and, as previously discussed, was relevant to the submitted aggravating circumstances. The warden's testimony is thus different in nature from Dr. Gilsanin's and did not open the sentencing phase of trial "as a forum for a general debate on the attributes of capital punishment." *Id.*

We have carefully examined the testimony of Warden Armontrout in light of our holding on the general admissibility of evidence pertaining to the deterrent impact of death sentences imposed for murders committed in correctional institutions, and find nothing which would constitute manifest injustice or a miscarriage of justice. Reversal is not warranted under the plain error doctrine, and defendant's point is denied.

## II

We next consider defendant's contention that the trial court erred "in refusing to compel the state to identify the confidential informant who had first identified [defendant] as the inmate who had stabbed Gary Barber...."

During the deposition of penitentiary investigator George Brooks, defense counsel inquired concerning an interoffice report in which Brooks stated, "I received information from a confidential source that Inmate Russell's previous problem with Barber involved Inmate Joseph Amrine." Pursuant to the prosecutor's instructions, Brooks declined to answer questions pertaining to

the identity of the confidential source, what the source told him, and whether the informant was endorsed as a witness for trial. At a pretrial hearing to determine the propriety of those questions, defense counsel argued he did not need to know the informant's identity, but that disclosure of information received from the confidential source might reveal "bias and prejudice on the part of this confidential informant" or lead to further discoverable evidence. The State pointed out the immediate and obvious risk to inmate informants whose identity is disclosed and noted that defendant had deposed all of the State's witnesses.

 Generally, communications made by informers to government officials are privileged and need not be disclosed. *State v. Yates*, 442 S.W.2d 21, 25 (Mo.1969). Concepts of fundamental fairness create exceptions to this rule in some cases; however, "the defendant bears the burden of developing a record showing the need for disclosure." *State v. Payne*, 660 S.W.2d 24, 25 (Mo.App.1983). The determination of whether a defendant can have a fair trial without disclosure of the confidential communication depends upon the circumstances of the case and is a matter resting within the sound discretion of the trial court. *State v. Corley*, 639 S.W.2d 94, 95 (Mo.App.1982). In reviewing the trial court's ruling we must balance the relevance of disclosure and importance to the defense against the State's need for nondisclosure. *State v. Sweeney*, 701 S.W.2d 420, 426 (Mo. banc 1985). "Disclosure is not required where testimony would be on 'minor or collateral issues.'" *Id.*

 Considering defendant's contention in light of those precepts, we conclude the court did not abuse its discretion in declining to order disclosure. The general nature of the information provided by the confidential source is clear from investigator Brooks's report, in which he stated that he received information pertaining to "Inmate Russell's *previous problem* with Barber" which "involved [defendant]." (Emphasis added.) There is no indication that the informant witnessed the stabbing or preparation for the murder, nor can it be

inferred that he identified defendant as Barber's killer. It appears the only fact to which he might testify was the altercation in early October between defendant, Russell, and Barber, an event which defendant conceded occurred. The informant's motive in reporting the prior dispute is not relevant to any contested issue and his testimony would have been minor, collateral, and cumulative of the other evidence.

Balanced against the insignificance of the evidence defendant sought to have disclosed is the interest of the State and the public in obtaining information regarding crimes from prison inmates and the obvious impediment forced disclosure of confidential tips poses to that interest. We cannot say the trial court abused its discretion in concluding that the balance of those competing interests militated against disclosure in this instance.

### III

 Defendant next contends the trial court committed plain error in submitting the first degree murder verdict directing instruction to the jury "because the converse paragraph was confusing, misleading, and nonsensical. . . ." The words "do not" were omitted from the converse paragraph of the instruction so that it read:

> However, *if you find and believe* from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree. (Emphasis added.)

The challenged instruction did not so misdirect or fail to instruct the jury as to cause manifest injustice or a miscarriage of justice, and its submission did not rise to the level of plain error. *State v. Williams*, 652 S.W.2d 102, 114 (Mo. banc 1983). Faced with a similar situation in *State v. Grothe*, 540 S.W.2d 221 (Mo.App.1976), the Court of Appeals aptly noted that any confusion engendered by the omission of the word "not" from the verdict directing instruction actually enured to the *benefit* of the defendant because if literally interpreted the jury was instructed to return a verdict of *not guilty* even if they *found all*

*the elements* contained in the instruction. *Id.* at 226. Defendant's point is ruled against him.

## IV

Defendant also poses several challenges to the instructions on aggravating circumstances submitted during the punishment phase. He first asserts the submission of Instruction No. 12, hypothesizing relevant statutory aggravating circumstances, constituted plain error "in that the instruction lists convictions of two charges of first degree robbery ... and such convictions do not necessarily establish that [defendant] has a history of *serious* assaultive convictions." [1]

Instruction No. 12 conforms with MAI–CR2d 13.40, which provides the appropriate form for instructing the jury on the aggravating circumstance that the defendant has one or more serious assaultive convictions. *See* section 565.032.2(1), RSMo 1986. It appears defendant's unartful complaint really pertains to the evidence adduced in support of the instruction rather than the instruction itself.

To establish defendant's prior serious assaultive convictions, the State introduced certified copies of prior judgments and convictions for two counts of first degree robbery on October 11, 1977 in Jackson County, entered upon defendant's pleas of guilty, for which defendant was sentenced to concurrent terms of fifteen years' imprisonment. Summaries of those exhibits were read to the jury. Defendant, relying upon *Schlup,* 724 S.W.2d at 236, contends that the State was required to present evidence "as to the nature of the assault included in the robbery so that the jury can assess its seriousness."

Defendant's argument is creative, but erroneous. In *Schlup,* the defendant contended that the trial court improperly admitted into evidence details of his prior crimes of second degree assault and robbery. This Court rejected defendant's argument, holding that the evidence was relevant and probative on the issue of whether the defendant had a *substantial* history of *serious* assaultive convictions.[2] *Id.* at 238–39 (emphasis in original). In so holding we focused on the wide range of conduct covered by second degree assault and sodomy, the offenses involved in that case. *Schlup* does not stand for the proposition that such evidence *must* be adduced in all cases involving the submission of prior convictions for serious assaultive crimes as an aggravating circumstance. Furthermore, were we to accept defendant's contention that *Schlup* requires such evidence in cases where the prior assaultive conviction is not necessarily "serious" within the meaning of section 565.032.2(1), that argument fails when the prior conviction is for first degree robbery, which is by definition serious and involves "serious physical injury," a "dangerous instrument," or a "deadly weapon." Section 569.020.1, RSMo 1986. If defendant felt that additional evidence pertaining to the convictions would aid his defense, he was free to introduce it. The court did not commit error, plain or otherwise, in submitting Instruction No. 12.

## V

Defendant also challenges the submission of both Instruction No. 12 and Instruction No. 13 on the ground that some of the prior offenses listed as nonstatutory aggravating circumstances in Instruction No. 13 were duplicative of those submitted in Instruction No. 12 as defendant's prior

---

1. Instruction No. 12 provided in pertinent part:

 In determining the punishment to be assessed against the defendant for the murder of Gary Charles Barber, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

 1. Whether the defendant was convicted of robbery in the first degree (2 charges) on October 11, 1977, in the Circuit Court of Jackson County, Missouri.

 2. Whether at the time of the murder of Gary Charles Barber the defendant was in the lawful custody of a place of lawful confinement.

 3. Whether Gary Charles Barber was an inmate of the Missouri State Penitentiary.

2. *State v. Schlup,* 724 S.W.2d 236 (Mo. banc 1987), was decided under section 565.012.2(1), RSMo 1978, the predecessor of section 565.032.-2, RSMo 1986.

serious assaultive convictions.[3] This claim may be succinctly answered by reference to *State v. Zeitvogel,* 707 S.W.2d 365, 369 (Mo. banc 1986), *cert. denied,* — U.S. ——, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986) in which we rejected an identical contention. Defendant's point is denied.

## VI

■■■In his final challenge to the instructions, defendant asserts that the court committed plain error in submitting Instruction No. 12 because "the aggravating circumstances that the [defendant] was in the lawful custody of a place of lawful confinement and that Gary Barber was an inmate of the Missouri State Penitentiary duplicated facts establishing the first degree murder itself."

Defendant acknowledges that this Court has repeatedly upheld the constitutionality of the aggravating circumstance that the murder was committed by a person in the lawful custody of a lawful place of confinement. *See, e.g., State v. O'Neal,* 718 S.W.2d 498 (Mo. banc 1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987); *Zeitvogel,* 707 S.W.2d at 365; *State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1983), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); and *Bolder,* 635 S.W.2d at 673.

However, he bases his challenge on an erroneous reading of *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985) and *Sumner v. Shuman,* — U.S. ——, 107 S.Ct. 2716, 97 L.Ed.2d 56 (U.S.1987). In *Collins,* the defendant was tried for capital felony murder as a result of a killing committed during a robbery. One of the aggravating circumstances submitted was that "the capital felony was committed for pecuniary gain." *Id.* at 263. The Eighth Circuit concluded that when an aggravating circumstance "merely repeats *an element of the underlying crime*" it does not " 'genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Id.* at 264 (quoting *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983)).

■■■ Defendant's reliance on *Collins* is misplaced. First, in this case defendant was not charged with felony murder, and therefore no "underlying crime" was involved. But the most significant fallacy in defendant's argument is its failure to differentiate between situations in which a statutory aggravating circumstance is also an *element* of the murder from those in which it is merely demonstrated by evidence elicited during the guilt phase of the trial. The State need not establish that the defendant was in the lawful custody of a place of lawful confinement or that the victim was also an inmate to establish the commission of first degree murder, and those aggravating circumstances do serve to distinguish first degree murder committed by inmates from first degree murders committed outside prison walls and thereby narrow the class of persons eligible for the death penalty.

■■■ Defendant's reliance on *Sumner* is also misplaced. In that recent case the United States Supreme Court held that a Nevada statute which provided for a *mandatory* death sentence in cases where an inmate is convicted of murder while serving a life sentence was unconstitutional.

---

**3.** Instruction No. 13 provided in pertinent part:

If you have found beyond a reasonable doubt that one or more of the aggravating circumstances submitted in Instruction No. 12 exist, then, in determining the punishment to be assessed against the defendant for the murder of Gary Charles Barber, you may also consider:

1. Whether the defendant pled guilty to burglary second degree and stealing on October 11, 1977, in the Circuit Court of Jackson County, Missouri.

2. Whether the defendant pled guilty of forgery using and uttering on October 11, 1977, in the Circuit Court of Jackson County, Missouri.

3. Whether the defendant pled guilty to robbery first degree on October 11, 1977, in the Circuit Court of Jackson County, Missouri.

4. Whether the defendant pled guilty to robbery first degree on October 11, 1977, in the Circuit Court of Jackson County, Missouri.

5. Whether the defendant pled guilty to unlawful use of a weapon on July 15, 1983, in the Circuit Court of Cole County, Missouri.

Unlike the Nevada statute, section 565.032 does not mandate the death sentence for inmates convicted of murder, and it requires the sentencer to consider relevant mitigating circumstances as well as assess what weight should be given to the submitted aggravating circumstances.

The trial court did not commit error, plain or otherwise, in submitting Instruction No. 12.

### VII

We next address defendant's claim that the court erred in failing to grant his supplemental motion for new trial based upon newly discovered evidence. The "newly discovered evidence" referred to in the motion is three letters allegedly written by State witness Randy Ferguson after defendant's trial and after Ferguson was removed from the Missouri State Penitentiary and placed in the Cole County Jail.

At the hearing on defendant's supplemental motion for new trial, Robert Arnold testified that while he and Ferguson were confined in the Cole County Jail Ferguson wrote three letters to him concerning Ferguson's testimony at defendant's trial.[4] The first letter, defendant's exhibit "A," indicated that Ferguson testified "to save [his] own ass," the second letter indicated that Ferguson did not see the stabbing and was asleep when it occurred, and the third letter allegedly contained a request from Ferguson that Arnold sell the previous notes to him for the $32.00 in his "account." Ferguson acknowledged writing the first letter, but denied he had written the other notes and reaffirmed the testimo-

ny he had given at defendant's trial. Two experts testified as to the results of handwriting analysis conducted on the notes. August Nilges, testifying on behalf of the State, concluded that exhibits "B" and "C" were *not* written by Ferguson and noted similarities between the handwriting in exhibits "B" and "C" and that of Arnold. Defense witness William Storer testified that he could not identify or eliminate either Ferguson or Arnold as the author of exhibits "B" or "C," and found both similarities and dissimilarities between Ferguson's handwriting and that contained in the disputed letters.

 As stated in *Williams*, 652 S.W.2d at 114:

To receive a new trial based on newly discovered evidence the following must be established: (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credit of the witness.

New trials on the basis of newly discovered evidence are not favored, and the trial court is vested with substantial discretion in deciding whether such should be granted. *Id.*

 It is gross understatement to say that Arnold's credibility was merely challenged at the hearing and the authenticity of Exhibits "B" and "C" was simply dis-

---

**4.** The contents of those handwritten letters, defendant's exhibits "A", "B", and "C", are set forth below verbatim:

**EXHIBIT "A"**

Now in the future I will trust you, because I know now that I can probably trust you on everything. It's just that I didn't know how you would feel, or react to me testifieing [sic] against another inmate even though it was to save my own ass.

But as I said, in the future I will trust you. Also I do very much appreciate your help.

Thank you,
Randy

**EXHIBIT "B"**

Randy—

No that wasn't what I meant, not the date— *why* did you testify against him? Did he make any threats towards you? You said not to say anything for Ron or Fred to pick up on so I couldn't ask you direct.

Bob

First off, I testified to get over here. I didn't see it happen, I was asleep but found out what happen from some people who saw it, so don't say anything to Showershoes or Fred.

Randy

**EXHIBIT "C"**

Bob,

Sell me them notes I have 32.00 I [sic] my account.

Randy

puted.[5] We cannot agree with defendant's contention that this "newly discovered evidence" established that his conviction was occasioned by perjured testimony and therefore mandated a new trial. At best, the evidence pertained to Ferguson's credibility and was merely of an impeaching nature. Nor can we say that the evidence would produce a different result at a new trial. Under these circumstances, the trial court did not abuse its discretion in denying defendant's motion.

## VIII

■ Defendant also contends that the court erred in directing that defendant be kept in partial restraints while in court and that he was thereby denied a fair trial. Defendant's legs were shackled to his chair; however, it is not clear from the record whether the jury could see those restraints. During a pretrial discussion the prosecutor noted that "from prior experience [my understanding is] that the bailiffs ... have the ability to shackle the defendant to the chair, leaving his hands free. And while it *might* be visible if the jurors *really studied,* it's *largely not visible from the jury box."* (Emphasis added.) It is evident that every effort was made to minimize the chance that the jury would notice the shackles, including declaring a recess so that the jury was not present when defendant was placed on the witness stand. At that point the judge stated: "I don't really know if they know he's chained to the chair or not ...," and he noted "the whole purpose of having the wire on the way it is, is so the jury can't see that the guy is shackled down." The judge also stated in the pretrial conference that he did not "want [defendant] paraded in front of the jury in handcuffs."

■ In reviewing the court's determination, we point out that the use of restraints for courtroom security purposes is within the discretion of the trial court. *O'Neal,* 718 S.W.2d at 502. The trial judge here attempted to minimize prejudice to the defendant while taking reasonable measures to preserve courtroom security. As in *O'Neal,* the court did not abuse its discretion. *Id.* at 502–503. Defendant's point is ruled against him.

## IX

■ Defendant next contends the court committed plain error in sentencing him to death because section "565.020 unconstitutionally permits a prosecutor to determine whom the state would seek to execute, particularly when the accused and the victim were inmates...." Challenges to the Missouri murder statute on the basis of prosecutorial discretion have previously been rejected, and in *Trimble,* 638 S.W.2d at 737, we held:

> Discretionary acts before the sentencing phase are irrelevant to whether the death penalty is arbitrary and capricious. Only discretionary acts that concern punishment and that occur after conviction for capital murder are relevant to this issue. Thus, the prosecutor's discretion to prosecute and the jury's discretion to acquit of capital murder are irrelevant.

We adhere to that holding, which adequately answers defendant's point.

## X

■ Defendant's contention that the death penalty imposed pursuant to the Missouri statutory scheme constitutes cruel and unusual punishment has also been repeatedly rejected and merits no further discussion here. *See, e.g., Newlon,* 627 S.W. 2d at 612–613.

## XI

■ Having addressed and fully considered defendant's assertions of error, we turn to our statutorily mandated duty to independently review the imposition of the death sentence. Section 565.035, RSMo 1986.

We have previously discussed the aggravating circumstances submitted to the jury in this case, *see* footnotes 1 and 3 *supra,* and the evidence firmly supports the jury's

---

**5.** Arnold was committed on an emergency basis to Fulton State Hospital two days after testify-

ing at the hearing as a result of his "bizarre" and irrational behavior.

determination that each of those aggravating circumstances existed. No mitigating circumstances were submitted. Our review of the record discloses no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we are directed to consider whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant. In reviewing previous cases involving death sentences imposed for murders committed within correctional institutions, we have found the sentence to be neither disproportionate or excessive. *See, e.g., Schlup,* 724 S.W.2d at 242; *O'Neal,* 718 S.W.2d at 504; and *Bolder,* 635 S.W.2d at 690. Here, on more than one occasion, the defendant carefully planned to murder the victim because of a perceived personal slight. His initial plan was inadvertently thwarted when Barber was placed in detention for fighting. Undeterred, defendant devised a scheme to acquire a weapon and kill Barber upon his release from detention. That time defendant's plan was successful. This case, involving a calculated, unprovoked stabbing in a correctional institution, is similar to others in which the death sentence has been imposed and affirmed, among which are *Schlup, O'Neal,* and *Bolder.*

We are unpersuaded by defendant's argument that the strength of the evidence in this case was weak because crucial testimony for the State was supplied by inmates. We need not repeat here all the evidence connecting defendant to the crime; we note, however, that two inmate witnesses called by the State observed the stabbing and testified that defendant murdered Barber. This was direct evidence connecting defendant with the crime. While defendant belittles the probative value of inmate testimony, his own evidence was precisely of that nature. The testimony of the inmates called by defendant indicating that Russell committed the murder was contradicted by evidence adduced by the State, including the testimony of correctional officers, which placed Russell outside of the

multipurpose room at the time of the crime. In short, the jury determined the credibility of the witnesses and the record amply supports its assessments in that regard. The evidence presented by the State in this case was substantial and provides no basis for distinguishing this case from others in which the death penalty has been imposed.

The judgment and sentence are affirmed.

BILLINGS, C.J., ROBERTSON and HIGGINS, JJ. and REINHARD, Special Judge, concur.

BLACKMAR, J. concurs in separate opinion filed.

WELLIVER, J., concurs and concurs in separate concurring opinion of BLACKMAR, J.

DONNELLY, J. not sitting.

BLACKMAR, Judge, concurring.

I am concerned about Point I in the opinion. I accept the narrow holding of the case, which is that there should be no reversal because Warden Armontrout's testimony about the deterrent effect of capital punishment and the prosecutor's related arguments were not objected to. It is not now necessary to decide whether the testimony could properly be admitted over objection.

*State v. Gilmore,* 681 S.W.2d 934 (Mo. banc 1984) does not hold that expert testimony to the effect that capital punishment does not operate as a deterrent is inadmissible. The precise point decided in that case was that the state did not have to provide funds in addition to those regularly allotted the public defender to hire an expert witness who would testify that capital punishment is not a reliable deterrent.

The authors of both opinions have overwritten. From the principal opinion in this case one might gather that the testimony of a corrections official in support of the deterrent effect of capital punishment is admissible, whereas the testimony of one who expressed a contrary opinion was "irrelevant to the issue at hand" and therefore presumably inadmissible. The rules

should surely be the same for both classes of testimony. If the state is to be allowed to parade corrections officials to hold forth on the supposed deterrent effect the defense should be able to counter this evidence. My tentative preference would be to exclude all of this opinion evidence, which deals with an issue expressly committed to the jury's discretion, leaving the jury free to perform the function the statutes entrust to it.

I agree with the principal opinion's holding that there is no prejudice in this case sufficient to withstand the absence of an objection, and therefore concur.