STATE of Missouri, Respondent,

v.

Joseph WHITFIELD, Appellant.

No. 77067.

Supreme Court of Missouri,
En Banc.

Jan. 21, 1997.
Rehearing Denied Feb. 25, 1997.

C. John Pleban, Richard P. Hereford, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Christine M. Blegen, Assistant Attorney General, Jefferson City, for respondent.

LIMBAUGH, Judge.

A jury convicted Joseph Whitfield of first degree murder and armed criminal action. After the jury deadlocked on punishment, the trial judge sentenced Whitfield to death on the murder charge and life in prison on the armed criminal action charge. The postconviction court overruled Whitfield's Rule 29.15 motion. This Court has jurisdiction. Mo. Const. art. V, § 3. We affirm the conviction, sentence, and denial of postconviction relief.

## I. FACTS

The evidence at trial, which we review in the light most favorable to the verdict, *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995), reveals the following:

On January 20, 1988, Ronald Chester, a paraplegic, picked up Maria Evans in his modified Lincoln to help him run some errands. Chester's wheelchair was in the front passenger seat, and Evans sat in back. After completing the errands, Chester drove to the area of Sarah and Hodiamont streets in St. Louis, where he spoke with Joseph Whitfield, the appellant.

Whitfield was accompanied by a young girl whom he identified as his daughter. An unidentified woman approached Chester's car, claimed to be the young girl's mother, and asked Chester to take Whitfield and the girl home. When Chester agreed to do so, Whitfield and the young girl climbed into the rear seat of Chester's car with Evans. Whitfield was seated in the left rear behind the driver's seat, the young girl in the center rear, and Evans on the right.

At Whitfield's request, Chester agreed to stop at a liquor store and then to take Whitfield to St. Ferdinand Street. When they arrived at St. Ferdinand Street, Whitfield exited Chester's car quickly, leaving the young girl behind. Chester, wanting to leave but not knowing what to do with the young girl, waited for thirty to forty minutes for Whitfield to return. When he did not, Chester returned to the area of Sarah and Ho-

diamont to look for the woman who had claimed to be the young girl's mother. Unable to find her, he returned to St. Ferdinand, all the while carrying Evans and the young girl in his back seat.

Upon returning to St. Ferdinand, Chester parked in the same spot where he had left Whitfield. After a few minutes, Whitfield returned to the car, asked where Chester had been, and said that he would be just a few more minutes. When Whitfield exited the car this time, Evans asked him to take the young girl, but he refused. He then walked along the street to a car parked on the opposite side from, and one or two car lengths behind, Chester's car. Charles Porter and his girlfriend Linda Scott were in this car. At trial Scott testified that they were in the neighborhood to have Varney Bolden, a friend of Porter's, babysit Porter's and Scott's children. Porter was a friend of Whitfield's, and Scott was acquainted with Whitfield.

Whitfield tried to obtain heroin from Porter and Scott, but Porter refused to give him any because Whitfield had no money. Porter then gave Whitfield a loaded .38 caliber pistol and said something, unclear from the testimony, about "the guy in the car across the street," namely Chester.

Whitfield left Porter's car and returned to Chester's car, reentering the back seat directly behind Chester. Evans was still in the rear passenger side seat, and the young girl in the center. Whitfield then struck Chester in the back of the head with the gun and struck Evans in the forehead with the gun. About the same time, Bolden walked up to Chester's car and urged Whitfield to shoot the two adults. Whitfield complied, shooting Chester twice in the head, causing Chester to slump across the steering wheel, and in turn causing the car to roll across the street and across the opposite curb. Whitfield then turned toward Evans, but Evans grabbed the young girl and used her as a shield. Instead of shooting, Whitfield exited the car, pulling the young girl with him. From the passenger side, he then fired back into the car, at some point hitting Evans in the hand. Evans, hurt but alive, played dead, and Whitfield, Bolden, and the young girl fled.

Officer Jerry Leyshock heard a report of the shooting on his police radio and, having been previously acquainted with Whitfield, suspected he might be involved. He went to Barnes Hospital to speak with Evans, from whom he learned that the shooter and the young girl were named "Joe" and "Jodie." Bolstered by this information, Officer Leyshock and several other officers went to a residence on Wells Street, where they located Whitfield, Scott, and Jodie. After retrieving the gun from the residence's bathroom, the officers arrested Whitfield.

## II. PROCEDURE

Whitfield's first trial ended on December 2, 1989, with a jury finding him guilty of first degree murder and recommending a sentence of death. That verdict and sentence were reversed on appeal. *State v. Whitfield*, 837 S.W.2d 503 (Mo. banc 1992). On retrial, the jury convicted Whitfield of first degree murder but could not agree during the penalty phase, voting 11–1 in favor of life imprisonment. Under the authority of § 565.030.4, RSMo 1994, the trial judge considered the statutory aggravating circumstances of Whitfield's previous convictions for second degree murder and manslaughter, the non-statutory aggravating circumstances of Whitfield's other, less serious crimes, and the mitigating circumstances, and imposed the death sentence. Whitfield timely filed a Rule 29.15 motion for postconviction relief setting out numerous claims, all denied. On appeal, Whitfield asserts several points of error, most of which involve various claims of ineffective assistance of counsel.

## III. VOIR DIRE

■ Whitfield asserts that the trial court erred when it overruled his motion to strike a certain venireperson for cause, necessitating the use of one of his peremptory challenges to remove this venireperson from the panel. The strike for cause, Whitfield explains, was grounded on the fact that the venireperson was the child of a homicide detective.

We need not review the trial court's decision not to remove this venireperson for

cause, however, because the venireperson did not serve on the jury. Under § 494.480.4, RSMo 1994:

> The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

This point of error is meritless.

## IV. INSTRUCTIONAL ERROR

### A. GUILT PHASE

■ Whitfield contends that the trial court erred by submitting jury instructions charging a crime different from that in the original information filed against him. Because this issue is raised for the first time in this Court, we review only for plain error, *State v. Isa*, 850 S.W.2d 876, 884 (Mo. banc 1993), and we will find plain error only where there is manifest injustice or a miscarriage of justice. Rule 29.12(b); *Isa*, 850 S.W.2d at 884.

■ The information charging Whitfield with murder in the first degree alleged that Whitfield acted with Varney Bolden in the shooting of Ronald Chester. Instruction No. 5, which was the verdict director submitting the charge of murder in the first degree, did not mention Bolden, and Whitfield now states that he would have presented his defense differently had he been charged as a solo actor. It is well-settled, however, that the State may charge a suspect either as a principal or as an accomplice with the same legal effect. *Isa*, 850 S.W.2d at 898. Thus, Whitfield cannot show that a new or different crime was submitted to the jury.

■ Moreover, the variance, even if it was actionable, was neither material nor prejudicial. Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges. *See State v. Ellis*, 853 S.W.2d 440, 443 (Mo.App.1993). As to materiality, appellant received adequate notice that he was charged with having been in-

volved in Chester's murder. Whether or not Whitfield was "acting with another" when he murdered Chester in no way vitiates the fact that Whitfield was apprised by the information that he had been implicated in the murder in this case. Appellant's ability to defend against the charge was also not affected. Whitfield claims that he believed he would be defending against "evidence that he and Varney Bolden acted together to commit the crime charged." His theory at trial, however, was that Varney Bolden had shot Chester and that he was simply sitting in the vehicle at the time of the shooting. The argument that the State should have instructed the jury to find Whitfield guilty if he or another person with whom he acted committed the murder was contrary to the defense strategy. Accordingly, the trial court committed no error, plain or otherwise, in submitting Instruction No. 5.

### B. PENALTY PHASE

■ Whitfield argues that the trial court erred in submitting during the penalty phase Instruction No. 22, the statutory aggravating circumstance instruction, which listed Whitfield's prior conviction for manslaughter as a serious assaultive offense. Manslaughter, he submits, is not a statutory aggravating circumstance under § 565.032.2(*l*), RSMo 1994, because it is not a serious assaultive offense. This matter was not raised in the motion for new trial, and again, we review only for plain error. Rule 30.20.

■ This Court recently determined that the line between serious assaultive offenses and other assaultive offenses is the line between felonies and misdemeanors. *State v. Kinder*, 942 S.W.2d 313, 332 (Mo. banc 1996). Manslaughter, whether voluntary or involuntary, is a felony offense. §§ 565.023, 565.024, RSMo 1994. Therefore, manslaughter is properly considered a serious assaultive offense for purposes of § 565.032.2(1). This point is denied.

## V. NEWLY DISCOVERED EVIDENCE

■ Whitfield asserts that the trial court erred in denying his motion for a new

trial, which he based in part upon alleged "newly discovered evidence" that he claims would likely produce a different result than the guilty verdict. To warrant a new trial based on post-trial newly discovered evidence, the defendant must show: (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credibility of the witness. *State v. Amrine,* 741 S.W.2d 665, 674 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988). The trial court has substantial discretion in ruling on a motion for a new trial based upon newly discovered evidence, and we will not disturb its decision absent an abuse of discretion. *Id.; State v. Williams,* 652 S.W.2d 102, 114 (Mo. banc 1983).

■ The purported newly discovered evidence consisted of testimony by Ava Toney and Willie Gream that they witnessed the shooting of Ronald Chester, and that it was carried out by a man standing outside of Chester's car, thereby ruling out the possibility that Whitfield shot Chester from inside the car. The trial court, after considering the testimony of Toney and Gream at the motion hearing, issued an extensive memorandum in which he determined that their testimony was insufficient to justify a new trial. In his appeal to this Court, Whitfield offers only the testimony of Gream to support his position.

According to the trial judge, Gream's testimony lacked credibility because Gream was a convicted felon who did not come forward until after trial, and whose story conflicted not only with other defense witnesses' versions at trial but also even with Toney's post-trial version of the shooting. Moreover, the trial court concluded that Gream's assertion that a man outside Chester's car did the shooting was cumulative because Whitfield's witness Gary Hackner had already testified at trial that a man outside Chester's car did the shooting. Considering both Gream's lack of credibility and the cumulative nature of his

testimony, we cannot say that the trial court abused its discretion in determining that the alleged newly discovered evidence would not probably produce a different result on a new trial. *See Amrine,* 741 S.W.2d at 674. Therefore, this point is denied.

## VI. RULE 29.15 PROCEEDINGS

### A. DISQUALIFICATION OF JUDGE

Whitfield asserts that his Rule 29.15 motion should have been heard before a different judge than the judge who conducted his trial, because the trial judge was biased against him and had an unacceptable proclivity to impose the death penalty, and he claims that the failure to sustain his motion to disqualify constitutes reversible error.

■ In ruling on motions to disqualify judges for cause, we begin from the presumption that judges act with honesty and integrity. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975); *Kinder,* 942 S.W.2d at 321. A judge should only be disqualified if a reasonable person, giving due regard to the presumption of honesty and integrity, would find an appearance of impropriety and doubt the impartiality of the court. *Kinder,* 942 S.W.2d at 321. Here, Whitfield contends that remarks and attitudes of the trial judge concerning the death penalty and punishment in general should have disqualified him from conducting the Rule 29.15 hearing. The specific remarks about which Whitfield complains come from the judge's Memorandum and Order setting Whitfield's punishment at death. The remarks include:

The Court is wont to observe that the law is both sword and shield. The shield of the law protects the criminal from his government; but just as surely that shield is supposed to protect the victim from the criminal, and ensure a civilized society. The sword of the law must be wielded only in conformity to due process; but, after a fair trial, it must be wielded.

And:

Defense counsel has thoughtfully provided the Court with two works critical of the death penalty, H. Prejean, *Dead Man Walking* (1993) and Bedau (ed.), *The Death*

*Penalty in America* (1982). The Court has "looked into" these works, as Samuel Johnson once put it, but the Court hopes that it may be excused for finding Mr. Lewis' thoughts on the subject more to its liking. See C.S. Lewis, "The Humanitarian Theory of Punishment," *God in the Dock* 287 (Hooper ed.1970); see also *Graham v. Collins,* [506 U.S. 461, 477–79], 113 S.Ct. 892, 903[, 122 L.Ed.2d 260,] (1993) (Thomas, J., concurring); *Morgan v. Illinois,* [504 U.S. 719, 749–52], 112 S.Ct. 2222, 2241–42[, 119 L.Ed.2d 492,] (1992) (Scalia, J., dissenting). However, the Court emphasizes that it has been governed in its task by the law and the evidence, and not by any personal convictions or propaganda regarding the death penalty.

These remarks, Whitfield argues, indicate that the judge has an unacceptable pro-death penalty bias that is so strong that the judge could not have fairly weighed the possible punishments to be meted out, and so was necessarily prejudiced against him. To the contrary, however, the remarks indicate that the judge weighed all manner of factors, including not only the works cited to him by defense counsel, but also works produced from independent research, in reaching the decision to sentence Whitfield to death. A judge's reference to works or judicial opinions that advocate the death penalty does not demonstrate a prejudice or bias on the part of that judge. The people and legislature of Missouri have deemed the death penalty an appropriate punishment in crimes of this type. § 565.020.2, RSMo 1994. The trial judge properly considered the aggravating circumstances and the mitigating circumstances, *see* §§ 565.030 and 565.032, RSMo 1994, stating as such in his Memorandum and Order: "the Court has carefully reweighed the aggravating circumstances ... against the mitigating circumstances, and is confident that the balance tips decisively and beyond doubt toward the aggravating circumstances." In listing the works he referred to in following the Missouri statutes, the judge did not give a reasonable person cause to find an appearance of impropriety and doubt the impartiality of the court. *Kinder,* 942 S.W.2d at 321 (slip op. at 3). If

anything, his comments and references show that he was conscientious in following the law and seeking proper guidance in the decision-making process.

Similarly, the judge's remarks concerning wielding the sword of the law against Whitfield would not give a reasonable person cause to find an appearance of impropriety and doubt the impartiality of the court. *Id.* This statement was not made before the judge weighed the aggravating and mitigating circumstances; therefore, it is not an indication of any pre-judgment bias the judge may have had in favor of the death penalty. Rather, the statement was made during the pronouncement of the judgment as an illustration and explanation of the penalty the judge had decided to impose—*after* the judge's aforementioned reasoning process had been completed. The complaint concerning this statement is frivolous.

 Whitfield also claims that the judge was a potential witness at the Rule 29.15 hearing and that this fact alone should have led to his disqualification. Effective administration of justice prefers that the trial judge oversee the Rule 29.15 hearing. *Thomas v. State,* 808 S.W.2d 364, 367 (Mo. banc 1991). Absent allegations of bias sufficient to require disqualification from a post-conviction relief proceeding and compelling evidence from the record or elsewhere in support of those allegations, the trial judge should not be called as a witness and would not be disqualified from conducting that proceeding. *See State v. Wise,* 879 S.W.2d 494, 523 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). After review of the record, as explained above, Whitfield's claim of judicial bias is baseless, and the trial court properly denied the motion.

## B. FAILURE TO COMPEL TESTIMONY

 Whitfield asserts that the Rule 29.15 court erred in not compelling Charles Porter to testify at the Rule 29.15 hearing. Whitfield admits, however, that Porter invoked his Fifth Amendment privilege against self-incrimination at the hearing by refusing to testify. If that invocation has any rational

basis, then the motion court could not compel Porter's testimony. *State v. Wilkinson,* 606 S.W.2d 632, 637 (Mo. banc 1980). As noted earlier, Porter was at the scene of the crime and allegedly provided Whitfield with the gun used to shoot Chester. At the Rule 29.15 hearing, the prosecutor confirmed that "if this witness did indeed inculpate himself into the murder of Ronald Chester, we would be interested in prosecuting him." These factors certainly provide a rational basis for Porter's decision to invoke his privilege against self-incrimination. Therefore, the Rule 29.15 court did not err in refusing to compel Porter to testify.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

To win reversal of his conviction or death sentence because of ineffective assistance of counsel, Whitfield must show that his counsel's performance was deficient, i.e., below the degree of skill, care, and diligence of a reasonably competent attorney, and that the deficiency prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). Indeed, he must show that his counsel failed both the performance and prejudice prongs of the *Strickland* test, and if he fails to satisfy either prong, we need not consider the other. *Sidebottom v. State,* 781 S.W.2d 791, 795–96 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). In reviewing the performance prong, Whitfield must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Furthermore, counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *State v. Storey,* 901 S.W.2d 886, 893 (Mo. banc 1995). To prove prejudice, Whitfield must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068;

*Tokar,* 918 S.W.2d at 761. Finally, the determinations of the motion court will not be disturbed unless they are clearly erroneous. Rule 29.15(j); *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987).

### 1. CROSS-EXAMINATION OF MARIA EVANS

Whitfield points out five instances in which he contends his counsel ineffectively cross-examined prosecution witness Maria Evans: (1) mishandling the impeachment of Evans by asking her if she had stated to Officer Preston Moore that she had heard Whitfield say "no" when Bolden told him to shoot Chester, because in fact she had made the statement to Officer Kerry Alexander instead of Officer Moore; (2) failing to impeach Evans with her statement to Officer Alexander that she had her eyes closed at the time of the shooting, and failing to obtain the audiotape of this statement; (3) failing to elicit from Evans a statement that the rear window of Chester's car was down at the time of the shooting; (4) failing to elicit from Evans the positions of Chester's head and the gun in Whitfield's hand at the time of the shooting; and (5) failing to elicit from Evans a statement that the rear driver's side door of Chester's car was open at the time of the shooting.

Whitfield cites *State v. Parker* for the proposition that a claimant can establish ineffective assistance of counsel based only on a showing *either* that a reasonable counsel would have cross-examined differently *or* that a different cross-examination would have changed the result of the trial. 886 S.W.2d 908 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). *Parker* says no such thing. In *Parker,* we responded to Parker's complaint of ineffective cross-examination by stating that Parker had failed "to show how a reasonable counsel would have cross-examined the witnesses or that a different cross-examination would have changed the result." *Id.* at 931. This statement merely says that Parker had failed to satisfy *either* prong of *Strickland;* it does not mean that if he had satisfied one prong his job would have been completed. It would not have been, for a claimant must show both

performance deficiency and resulting prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Generally, the subjects covered during cross-examination and the extent of cross-examination are matters of trial strategy that must be left to the judgment of counsel. *State v. Kinder*, 942 S.W.2d 313, 335 (Mo. banc 1996). In this case, however, trial counsel testified during postconviction proceedings that she had no trial strategy in several of the omissions identified by Whitfield. But her postconviction testimony is not conclusive of whether the alleged omissions in cross-examination were, in fact, trial strategy, although her post-trial statements will certainly be helpful in making these determinations. *State v. Light*, 835 S.W.2d 933, 940 (Mo.App.1992). Instead, a reviewing court undertakes an independent assessment of whether a particular action was truly trial strategy, recognizing that overzealous counsel seeking to gain a new trial for their client may downplay their performance at trial.

The motion court was not clearly erroneous in concluding that none of the omissions during trial counsel's cross-examination of Evans amount to ineffective assistance of counsel. The extensiveness of the cross-examination alone—a cross-examination that covered over fifty pages of typed transcript—is a strong indication that the omissions cannot be said to be ineffective assistance. *See O'Neal v. State*, 766 S.W.2d 91, 98 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). Trial counsel did ask Evans about Officer Moore instead of Officer Alexander, but we cannot conclude that counsel's credibility was so destroyed in the eyes of the jury that there arises a reasonable probability that the result of the proceeding would have been different—i.e., that Whitfield would have been acquitted instead of convicted. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Even if the question had been properly put to Evans and she had responded that Whitfield said "no" when Bolden allegedly told him to shoot Chester, there is still no reasonable probability that the outcome of the trial would have been different. Evans testified repeatedly that she saw Whitfield do the actual shooting.

Nor does trial counsel's failure to impeach Evans with an audiotaped statement that she had her eyes closed at the time of the shooting undermine our confidence in the outcome of the case. In fact, Evans specifically stated during cross-examination that she heard the shots while she closed her eyes and pretended that she was dead; thus, the information on the tape would have been cumulative. Likewise, trial counsel's other alleged omissions also fail to raise a reasonable probability that the result of the proceeding would have been different had counsel proceeded as Whitfield now desires. In fact, the alleged omissions internally conflict; for instance, if the rear left window was down, it would not matter that the rear left door was open, and vice versa. Furthermore, Whitfield's theory that Bolden did the shooting from outside the car was presented through other evidence. The point is denied.

## 2. CROSS-EXAMINATION OF LINDA SCOTT

Whitfield next claims his counsel ineffectively cross-examined Linda Scott in failing to elicit from her that she saw the shooter standing outside Chester's car, in not playing an audiotaped interview with her in which she stated as such, and in failing to depose her before trial. None of these alleged failings, however, amount to ineffective assistance of counsel.

Even though trial counsel testified that her decision not to confront Scott with the audiotaped pre-trial interview was not a matter of trial strategy, the Rule 29.15 court convincingly demonstrated that it most likely was. This conclusion arises because, according to the findings of the Rule 29.15 court, the audiotaped interview contained specific statements by Scott that Whitfield was the shooter, statements that could have been severely detrimental to Whitfield's case and that were not replicated by Scott at trial. Therefore, the court concluded that Scott's trial testimony was actually more beneficial to Whitfield than the audiotaped statement. We do not find that this conclusion is clearly erroneous.

Whitfield's additional complaint about his counsel's failure to depose Scott is empty. His counsel conducted a telephone interview with Scott several weeks before trial. Whitfield has not alleged what information his counsel could have elicited from Scott in a deposition that she could not have obtained in the telephone interview. In short, counsel's trial preparation was unaffected; therefore, Whitfield cannot be said to be prejudiced by her failure to depose Scott.

### 3. FAILURE TO INTERVIEW/CALL CHARLES PORTER

Whitfield avers that his counsel was ineffective in failing to interview Charles Porter or call him to testify at trial. According to Whitfield, Porter would have testified that he did not in fact give Whitfield a gun, in contradiction to Linda Scott's testimony that Porter did give Whitfield a gun. To support his claim of ineffective assistance of counsel for failure to interview and call Porter, Whitfield must show that Porter was available to testify, would have testified if called, and would have provided a viable defense through his testimony. *State v. Twenter*, 818 S.W.2d 628, 639–40 (Mo. banc 1991).

Whitfield has failed to demonstrate, however, that Porter would have testified in his behalf if called, and Porter's post-trial conduct indicates that it is unlikely that he would have testified favorably for Whitfield, if at all. Porter had been uncooperative in a short deposition and had invoked his Fifth Amendment right against self-incrimination in refusing to testify at the postconviction hearing. There is simply no evidence to indicate that he would have testified favorably for Whitfield at trial; therefore, there is no ineffective assistance in failing to call him. This point is denied.

### 4. FAILURE TO INVESTIGATE/IMPEACH JERRY LEYSHOCK

Whitfield claims his counsel was also ineffective in failing to investigate or impeach prosecution witness Officer Jerry Leyshock for his alleged reputation of untruthfulness and for alleged instances of prior misconduct. This claim is baseless regardless of whether these inactions were the result of trial strategy. The two instances where Whitfield alleges that judges complained of Leyshock are unsupported by the evidence. Two other instances where Leyshock was disciplined by the St. Louis City Police Department involve minor incidents that do not speak to his credibility. There is not a reasonable probability that the outcome of the trial would have been different had trial counsel impeached Leyshock with these incidents. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. This point is denied.

### 5. FAILURE TO OBJECT TO DRUG EVIDENCE

Whitfield argues that his counsel was ineffective in failing to object to evidence that Linda Scott gave Whitfield heroin. During post-trial proceedings, Whitfield's trial counsel testified that she did not object to this evidence because of trial strategy. She said that regardless of the admission of this testimony, she felt that the jury would know that drugs were involved in this incident; therefore, she made a strategic decision to focus her attention regarding Scott on other matters. While it is true that we need not take at face value trial counsel's statement of whether a particular decision was trial strategy, *see Light*, 835 S.W.2d at 940, given the circumstances of this case, counsel's reasoning and decision were sound. We conclude, therefore, that the failure to object to Scott's testimony was legitimate trial strategy, which does not constitute ineffective assistance.

### 6. PREVENTING WHITFIELD FROM TESTIFYING IN HIS OWN BEHALF

Whitfield next contends that his counsel was ineffective in preventing him from testifying in his own behalf at trial. In support, Whitfield refers only to the end of the prosecution's closing argument during the penalty phase of the trial, at which time Whitfield asked the court, "[c]an I talk in my own behalf?"

The court properly denied Whitfield's request to speak extemporaneously to the jury at the end of opposing counsel's penalty phase closing argument. *Cf. U.S. v.*

*Blum,* 65 F.3d 1436, 1444 (8th Cir.1995) (affirming trial court's decision not to allow defendant to testify at the close of evidence during the guilt phase of trial), *cert. denied,* —— U.S. ——, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996). Had Whitfield so desired, he could have testified during the trial or penalty phases during his case-in-chief. *See* § 546.260, RSMo 1994.

 Whitfield's trial counsel testified at the 29.15 hearing that at trial she had discussed with Whitfield her opinion that it was better trial strategy for him not to testify, and that he had agreed to this course of action. Whitfield did not testify at the postconviction proceeding and did not refute his counsel's testimony. Further, Whitfield does not allege what he would have testified to had he taken the stand. In sum, we cannot say that the Rule 29.15 court clearly erred in deeming Whitfield's counsel's testimony credible and finding that counsel did not prevent Whitfield from testifying in his own behalf. This claim is rejected.

## 7. FAILURE TO DISQUALIFY JUDGE

Whitfield next complains that trial counsel was ineffective for failing to take all steps necessary to disqualify the trial judge from presiding over the penalty phase proceeding. Having already determined that there were no grounds to support disqualification of the judge, trial counsel cannot be faulted for being ineffective. As part of his argument, Whitfield submits that the failure of his counsel to voir dire the trial judge concerning the judge's attitude toward the death penalty alone constitutes ineffective assistance. There is no authority for this proposition, which we deem to be frivolous.

## 8. JURY INSTRUCTIONS

 Whitfield claims his counsel was ineffective in failing to object to several jury instructions which tracked the language of § 565.020, RSMo 1994, but failed to include the final clause of subsection 2 of that statute. Subsection 2 reads:

> Murder in the first degree is a class A felony, and the punishment shall be either death or imprisonment for life without eligibility for probation or parole, or release *except by act of the governor* . . . . (emphasis added)

The jury instructions of which Whitfield complains did not include the language stating that a convict may be released by act of the governor. It is counterintuitive, however, for a defendant to object to these jury instructions; presumably, a jury that has already convicted a person of first degree murder would be *more* likely to sentence that person to death if they were instructed of the possibility of his release by act of the governor. If the instructions had included this information, undoubtedly Whitfield would be complaining of prejudice for its inclusion. Counsel's decision not to object to these jury instructions was sound trial strategy.

## 9. CUMULATIVE EFFECT

Finally, Whitfield claims his counsel was ineffective in a general, overall sense, owing to "multiple, cumulative errors." Because counsel was never ineffective in any individual instance, she necessarily could not be ineffective in a holistic sense. This claim is rejected.

## VII. PROPORTIONALITY REVIEW

 Under § 565.035, RSMo 1994, this Court is required to review the "proportionality" of the sentence of death imposed in this case. There is no evidence in the record before us that the judge imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor. Further, the statutory aggravating circumstances found by the sentencing judge, namely that Whitfield's previous convictions for murder and manslaughter constitute serious assaultive offenses, are amply supported by the evidence. Finally, the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant's history. The execution-style shooting of a defenseless victim certainly justifies the death penalty, *see generally State v. Foster,* 700 S.W.2d 440 (Mo. banc 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986), and *State v.*

*Murray,* 744 S.W.2d 762 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988), especially considering that the victim was a paraplegic. The fact that Whitfield has committed several prior serious assaultive offenses adds further support for the imposition of the death penalty. *Cf. Foster,* 700 S.W.2d 440; *State v. Chambers,* 714 S.W.2d 527 (Mo. banc 1986).

## VIII. CONCLUSION

For the above reasons, the judgments are affirmed.

All concur.